[Crim. No. 5565.   Second Dist., Div. Two.   May 28, 1956.]

THE PEOPLE, Respondent, v. PAUL G. CARPENTER, Appellant.

Monroe & Chula and George H. Chula for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

FOX, J.—This case grows out of a bank night drawing at the Lakewood Theater, in Lakewood, California. Appellant was convicted, together with other defendants who have not appealed, of conspiracy to cheat and defraud by criminal means and to commit grand theft, and of the crime of grand theft. He appeals from the judgment* and the order denying his motion for a new trial.

Appellant's contentions are: (1) The bank night drawing was a lottery and therefore illegal; and (2) he and his associates did nothing more than fail to observe the rules of the game and that securing money by failing to observe the rules of an illegal lottery does not constitute a criminal offense. It is therefore necessary to delineate the bank night *modus operandi* and appellant's activities.

Late in 1950, as an advertising technique and in the hope of encouraging theater attendance, the operators of Lakewood Theater commenced to get registrations for proposed bank night drawings. They solicited registrations from house to house, and gave registration blanks to people in the theater, asking them whether they would like to register for bank night. This continued until several thousand names had been registered before bank nights were started. Thereafter, registration blanks were kept at the snack bar and sometimes at the box office and given to anyone who asked for them. It was not necessary to buy a ticket to register for bank night. A ticket containing each number was put into a drum kept by the theater as the name to which it was assigned was placed in the book; once a person was registered he was eligible to win at any bank night thereafter. After the bank nights were started, registrations for a bank night at the Circle Theater were combined with those secured for the Lakewood Theater when the former theater was taken over by the owners of the latter.

---

*Appellant was granted probation but under Penal Code, section 1237, such an order is deemed a final judgment for purposes of appeal.

On bank night, which occurred once a week, the drum containing the numbered tickets was taken to the stage of the theater during intermission, and a person chosen by someone connected with the theater would put his hand into it and select a ticket at random. The ticket was withdrawn and given to the theater manager, who compared the number thereon with the numbers in the registration book and determined whose name was represented by that number. When that determination had been made, the name was announced over microphones directed within and without the theater, and the person of that name was given two minutes to reach the stage, where he was required to identify himself.

It was not necessary to pay admission to be present for the drawing and the announcement of the name on bank night, nor for claiming the award. Persons who wished to do so were permitted to enter the theater free for the purpose of seeing and hearing the drawing and announcement. The Lakewood-Circle Theaters' bank night drawings were conducted at the Lakewood for four weeks, and then the drum containing the tickets would be transported to the Circle, where the drawings would be held for four weeks. A person whose name was called could present himself at either theater and claim the drawing.

In the early part of January, 1954, defendant Floyd Jones talked to Richard Owen Landon, whom he had known for some years, about a scheme to make some money. Landon was not interested at that time. Two weeks later Jones called at the Landon home and asked whether he would like to make a few dollars for the use of his name for a drawing at one of the theaters. Jones told him that somebody working for the theater had entered his name in the book and it was all set up. He said that Landon would get a percentage of what was won at the drawing; Landon was to be at a certain theater at a certain date, where his name would be called and he would win the money.

Jones and Landon went to the Lakewood Theater on three successive bank nights but were unable to arrange for a confederate to do the drawing. Their luck changed, however, on Thursday night, February 9th. On that evening Landon met Jones in front of the Lakewood Theater. Jones had a small orange ticket which he said he had gotten through the theater; he told Landon he was going to give it to a party who would volunteer to do the drawing. Jones directed Landon to go to the Circle Theater. That evening appellant

Carpenter contacted Mr. Wells, manager of the Lakewood Theater, and asked questions about how he handled the bank night drawing. Wells felt, from Carpenter's conversation, that he was not satisfied the management was handling the drawing right. As a consequence, Wells asked Carpenter to draw the ticket that night. He purportedly drew the ticket, and Landon was announced as the winner. He identified himself and claimed the drawing at the Circle Theater. Landon's name had been added to the registration book by taping it over the name of another registrant. This was proper under certain circumstances but they were not present in this instance. The theater management, however, was apparently unaware of this.

The following week Landon went to the Circle Theater and was given a check for $4,000. After he received it, he went to Jones' home, as Jones had instructed him; there Jones said that he had instructions to keep the check overnight, and that he would give Landon his personal check for $900 which he did. The next morning Jones and Landon went to Los Angeles to have the check "OK'd" by an official of the theater and get it cashed. Landon kept $900 of the money he received and gave the rest to Jones. Carpenter had followed them in another car.

In later conversation with Deputy Sheriff Garbe, Carpenter told him he had participated in a bank night drawing at the Lakewood Theater; that he presented as the lucky ticket one that previously had been given to him by Jones; that Landon was the "winner," and that when they got the check cashed Jones gave him $400.

The initial question is, Was the bank night drawing a lottery? A lottery is defined by Penal Code, section 319, as "any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it . . . upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift-enterprise, or by whatever name the same may be known."

The elements necessary to constitute a lottery have been judicially stated to be: "(1) The disposition of property, (2) upon a contingency determined by chance, (3) to a person who has paid a valuable consideration for the chance of winning the prize; that is to say, one who has hazarded

something of value upon the chance." (*People* v. *Cardas,* 137 Cal.App.Supp. 788, 790 [28 P.2d 99].)

■ Was the disposition of the $4,000 here involved "upon a contingency determined by chance"? The appellant and his coconspirators prevented any element of chance whatsoever from occurring in the determination of who was to receive the bank night award. When the appellant pretended to draw a ticket from the drum he had no intention of drawing a ticket by chance, and he did not do so. He intended to draw and present as the winning ticket the one that he had palmed, and which contained a number corresponding to the name of a coconspirator which had been added to the registration book. As the appellant had predetermined which ticket was to be drawn and presented, the determination of which ticket was to be drawn and who the winner of the money would be, could not have been, and was not, by chance. This theory finds support in *Catts* v. *Phalen,* 43 U. S. 375 [11 L.Ed. 306], which was an action to recover money obtained at a drawing by means similar to those employed here and which the court characterized as "a deeply concocted, deliberate, gross, and most wicked fraud." The court held the fraud avoided the drawing and placed the perpetrator in the same position as if there had been no drawing in fact.

It therefore follows that the appellant cannot successfully maintain that the game in which he and his coconspirators secured the bank night award was a lottery, inasmuch as he, by his own acts, eliminated the element of chance in the determination of the winner.

We come now to the third element in a lottery, viz: consideration for the chance of winning the prize. The question of consideration is not to be determined from the standpoint of the defendant, but from that of the holders of prize tickets. The question is: Did the holders of prize tickets pay a valuable consideration for the chance? Certainly those who received prize tickets without buying an admission ticket did not pay anything for the chance of getting the prize. They did not hazard anything of value. It would then seem to follow that those who purchased admission tickets and received prize tickets, not at the box office but from another employee, could not be said to have paid a consideration for the prize tickets since they could have received them free.

The court in the Cardas case, *supra,* relied on *Cross* v. *People,* 18 Colo. 321 [32 P. 821, 36 Am.St.Rep. 292]. In discussing the element of consideration in a lottery, the Colo-

rado Supreme Court stated: ''By the admitted facts it is shown that the plaintiffs in error gave business cards which entitled the holders to a chance on a piano, to be distributed as the holders of such chances might elect. These tickets or chances were given indiscriminately to persons, whether they purchased goods of plaintiffs in error or not, to those who registered their names at their shoe store, and to those who, from a distance, sent the return postage. While it is admitted that Charles Linton purchased goods to the amount of one dollar at their store, and received one of these cards, it is admitted that such purchase, or any purchase of goods, was not a condition upon which the card was delivered. The fact that such cards or chances were given away to induce persons to visit their store with the expectation that they might purchase goods, and thereby increase their trade, is a benefit too remote to constitute a consideration for the chances. Persons holding these cards, although not present, were, equally with those visiting their store, entitled to draw the prize. The element of gambling that is necessary to constitute this a lottery within the purview of the statute, to wit, the paying of money, directly or indirectly, for the chance of drawing the piano, is lacking, and the transaction did not constitute a violation of the statute.''

Here, before bank night drawings commenced, solicitors went from door to door to secure names for the bank night registration book. At the same time, persons who patronized the theater were given registration blanks and were asked whether they would like to register for bank night. After several thousand names had been secured for the registration book in this manner, bank night drawings commenced. Thereafter, registration blanks were kept at the snack bar and box office, and anyone who asked for one was given it, and in order to register it was not necessary to buy a ticket. Once a person had registered, he could win at any bank night drawing thereafter. Names previously registered at another theater were later included. The name of the winner was announced over microphones directed within and without the theater, and the person whose name was drawn had two minutes to reach the stage. Anyone who wished to do so was permitted to enter the theater without paying for the purpose of seeing and hearing the drawing. It was not necessary to pay admission to be entitled to claim the award.

█ Certainly those who registered upon request of a solicitor without attending the theater did not pay for the

chance of getting the prize; neither did those who later registered without purchasing an admission ticket. Those who purchased admission tickets and then registered while they were at the theater as patrons, cannot be said to have paid a consideration for the privilege of registering, as they could have done so without buying an admission ticket. Once a person's name was registered, it might be drawn at any bank night thereafter, and it was not necessary that he purchase an admission ticket either to listen to or see the bank night drawing or to claim the award if his name was called.

It therefore follows, under the principles of the Cardas case, *supra,* that no consideration was paid for the chance of winning the bank night prize in the instant case.

For the foregoing reasons it is apparent that the fake drawing in which appellant participated was not a lottery.

Our conclusion that the drawing in question was not a lottery and was not illegal destroys the basis of appellant's second contention, viz., that he merely violated the rules of an illegal game and that this is not a criminal offense.

■ The activities of appellant and his coconspirators, however, went far beyond a mere violation of the theater's rules for bank night drawings. They arranged to have the name of one of their group placed on the register opposite the number that was on the ticket to be drawn, which it may be inferred they stole from the drum or otherwise wrongfully acquired. Appellant arranged to draw the winning ticket, which must have been done by chance if the drawing was in fact a lottery. Instead of drawing a ticket by chance, appellant palmed the surreptitiously acquired ticket and pretended to draw it from the drum. As a result of its presentation as the winning ticket drawn by chance from the drum, one of appellant's coconspirators received the $4,000 bank night award. As pointed out in *Catts* v. *Phalen, supra,* the fraudulent acts on the part of appellant and his associates avoided the drawing and placed them in the position of having no right whatever to the bank night money. Nevertheless, by concealing the true facts, they thereafter secured such money. Their getting the money was without the real consent of the theater operators, who would not have turned the money over to them if they had known the true facts. This was therefore a felonious taking of the property of the theater operators by trick, and false and fraudulent representations, and was a crime under the law of this state. (Pen. Code, § 484; *People* v. *Rial,* 23 Cal.App. 713, 717-718 [139 P. 661].)

Appellant relies on *People* v. *Gonzales,* 62 Cal.App.2d 274 [144 P.2d 605]. There is nothing in that case inconsistent with our decision in the instant matter.

The judgment and order are affirmed.

Moore, P. J., and Ashburn, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 27, 1956.