[Crim. No. 28561. Second Dist., Div. One. Sept. 30, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES RAY SHIRA et al., Defendants and Appellants.

[And 4 other cases.]*

*People v. Dickinson; People v. Planchard; People v. Thompson; People v. Hagen.

**COUNSEL**

Samuelson & Carlin and Gary R. Carlin for Defendants and Appellants.

Robert W. Parkin, City Prosecutor, and Robert R. Recknagel, Assistant City Prosecutor, for Plaintiff and Respondent.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Roger W. Boren, Deputy Attorneys General, John K. Van de Kamp, District Attorney (Los Angeles) Harry B. Sondheim and Eugene D. Tavris, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**HANSON, J.—**

THE CASE

The nine consolidated cases at bench, emanating from the Long Beach Municipal Court, involve the legality of the game called RINGO. The case comes up on appeal from a final judgment of conviction for operating an illegal lottery as defined in Penal Code section 319[1] (hereinafter section 319).

The five (5) named defendants/appellants Charles Ray Shira, Vickie L. Dickinson, Ben Timothy Planchard, Glenn Everett Thompson, and Edward Hagen (hereinafter defendants) were convicted, following a jury trial, of violation of either Penal Code section 320[2] (contriving, preparing, setting up, proposing and drawing lottery) or Penal Code section 322[3] (aiding or assisting in setting up, managing or drawing a lottery) and of violating Municipal Code section 4140.7[4] (carrying on and conducting a game of chance played with balls).

The defendants appealed to the appellate department of the superior court which reversed the judgment of the trial court on each of the above referred to actions holding RINGO was not a lottery (Judge Alarcon dissenting) and certified the opinion for publication in the Advance California Appellate Reports. Thereafter, the case was ordered trans-

---

[1]Penal Code section 319 defines a lottery as follows:
"A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift-enterprise, or by whatever name the same may be known."

[2]Penal Code section 320 provides: "Every person who contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor."

[3]Penal Code section 322 provides: "Every person who aids or assists, either by printing, writing, advertising, publishing, or otherwise in setting up, managing, or drawing any lottery, or in selling or disposing of any ticket, chance, or share therein, is guilty of a misdemeanor."

[4]Long Beach Municipal Code section 4140.7 in pertinent part provides as follows: "No person shall . . . as owner or employee open, deal, play, carry on or conduct any game of chance . . ."

ferred to this court for hearing and decision pursuant to rule 62(a), California Rules of Court.[5]

## THE FACTS

█ The cases at bench arose out of a game called RINGO conducted by defendants in the amusement zone at 130 West Pike, Long Beach, California, on August 23, 1974, and September 3, 1974. It was stipulated at the trial that defendant Shira had been issued a 100-seat "Amusement-Skill" business license on June 6, 1974, by the City of Long Beach to operate RINGO for an annual fee of $5,700.[6]

The premises where RINGO was played were at all times open to the public at large and no admission fee to enter the premises was charged to any person. The rules and mechanics of the game substantially as hereinafter described were conspicuously posted on the premises and distributed to the public at large.

The game called RINGO consists of numerous individual games played over a period of time. Each game is played in three phases as follows:

## PHASE I

All persons participating in the game sit at one of twenty tables. Each table contains five seats. Each seat is opposite and three to four feet from a peg. Each person is given one small red ring free of charge.

[5]Rule 62(a), California Rules of Court provides: "A Court of Appeal may order a case transferred to it for hearing and decision when the superior court certifies or the Court of Appeal on its own motion determines from an opinion of the appellate department published or to be published in Advance California Appellate Reports that such transfer appears necessary to secure uniformity of decision or to settle important questions of law."

[6]The issuance of a business license by the City of Long Beach is immaterial as to whether or not the game of RINGO is a lottery.

Defendant Shira successfully contested an order by the City Council of Long Beach annulling a prior order granting an amusement license to operate the RINGO game in the city as a game of skill. We take judicial notice of the unpublished opinion in *C. Ray Shira* v. *City of Long Beach* (2d Civil No. 38380, Super. Ct. No. SOC 22071), filed December 27, 1971, in which the appellate court found that the original hearing by the city council granting the license was a final determination of a factual matter and therefore "the Council was without jurisdiction in the same proceeding and on the same record . . . to reconsider and to annul its prior action." The court stated, "It should be noted that our decision does not require us to, nor have we, determined expressly or impliedly that RINGO is a game of skill and should be licensed."

Each person who successfully tosses the red free ring (approximately one and one-half-inch inside diameter) over the peg (approximately one-inch outside diameter) opposite his seat is given two "Bingo" cards free of charge and is allowed to participate in the second phase without charge.

Each person who is unsuccessful in encircling the peg with the free red ring could, but is not obligated to, buy as many white rings (approximately the same size as the red ring) as desired for 25 cents each and receives two "Bingo" cards with each white ring purchased.

If he is successful in encircling the peg with any purchased white ring, his 25 cents is refunded and the player is allowed to keep the two "Bingo" cards and enter the second phase of the game.

If the player is unsuccessful in tossing any white ring over the peg, the operators retained the 25 cents.

## Phase II

All those persons remaining in the game after the red and white ring toss (phase I) is completed are required to cover a row of numbers with penny sized white chips, in any direction, on any one of their "Bingo" cards (no two cards are exactly alike and the center number is free) as the matching or corresponding numbers were called out on a random basis from a squirrel cage type device containing 75 consecutively numbered ping pong balls. The numbers called are also indicated on an electrical sign for viewing by the players. The first person or persons who successfully cover a row of numbers qualifies for the final phase of the game.

## Phase III

Those person(s) who first successfully cover a row of numbers on their "Bingo" cards during phase II are provided, without charge, three larger rings to be thrown over a thicker peg. No one other than the "Bingo" winner(s) are permitted to participate in this final portion of the game.

The person who successfully throws at least one of the three larger rings three and one-fourth-inch inside diameter) over the thick peg (two-inch outside diameter) wins the prize.

The prizes vary from $10, $15 to $25 depending on the type of game. The larger prizes are given when the entire card is required to be covered in a "blackout" or "cover all" "Bingo" game during phase II. The amount of the prize is declared prior to the commencement of each game.

The person who is unsuccessful in encircling at least one of the three large rings over the peg wins nothing and the game is over.

The reporter's transcript of the trial[7] reflects that the prosecution and defense evidence was primarily directed at the issue as to whether skill or chance predominates in the RINGO game.

Testimony at the trial established the success factor of tossing the small red and white rings (phase I) and one of the three larger rings (phase III) over the pegs as follows:

A. *The small red and white rings (phase I)*—The prosecution witness, arresting Officer Harry Welch of the Long Beach Police Department, testified, based on personal experience and observation, that the success factor of encircling a small peg with a small red or white ring is 25 percent and the likelihood of failure is 75 percent.

Defendants' expert witness Dr. Robert Dilworth, a professor of mathematics specializing in probabilities and statistics, testified, based on experiments with RINGO consisting of 160 games conducted with 10 student players, that the success factor of tossing 1 of the small red or white rings over the peg is 12 percent and the likelihood of failure is 88 percent. For the sake of brevity, the defense expert testimony as to success and failure percentages on the small rings will be used for discussion purposes. The result would be the same if prosecution testimony was used.

B. *The three large rings (phase III)*—Prosecution witness Officer Welch testified that from 85 percent to 90 percent who win at "Bingo" in phase II could get at least one of the three large rings on the peg and that 10 percent to 15 percent miss on all three rings.

Pursuant to California Rules of Court, rule 12(a), on our own motion we have augmented the record on appeal by ordering up the superior court files and the reporter's transcript of the complete trial.

Officer Welch further testified in respect to the small red or white ring tossing portion of the game (phase I) that since the rings were not exactly concentric but a "little bit egg-shaped, lopsided," with a weight differential, it is 50-50 skill and chance; that about 1,000 "Bingo" cards were confiscated and that in his opinion "Bingo" is strictly a game of chance and that chance also predominates in RINGO.[8]

---

[8]On direct examination Officer Welch also testified, in part, as follows:

"Q All right. Now, at some point did you form an opinion as to Bingo and whether or not it was a game of chance or skill?

"A Oh, yes, I did.

"Q What is your opinion about Bingo?

"A Definitely, that Bingo is a game of chance.

"Q Now, are you familiar with the game of Ringo?

"A Yes, I am."

. . . . . . . . . . . . . . . .

"Q Okay. Based on your observations and your past experience, did you form an opinion as to the game of Ringo and whether or not it was predominantly, the result of that game is predominantly determined by chance or by skill?

"A Yes. I formed an opinion on the game of Ringo.

"Q And what was your opinion? What is your opinion?

"A My opinion of the game of Ringo is that it definitely is a game of chance. It's a gambling game."

. . . . . . . . . . . . . . . .

"Q All right. Now, does the throwing of the small rings, No. 4 and No. 5, does this in any way have any determination on the result as to who wins the game?

"A Not a bit.

"Q What is then its function as far as the game as a total?

"A Well, it determines how much you pay to play the game. If you are successful in ringing the red one, why you get 2 cards free. If you can go ahead and buy your other cards, and the white rings, you pay 25¢ a piece for them. You get 2 cards, and if you are successful in ringing one of the white cards, why you get your 25¢ back. But actually, it just determines how much each individual is going to pay to play their game and how many cards they play."

. . . . . . . . . . . . . . . .

"Q Lieutenant, with reference to the different sizes of the rings and the different size of the pegs, is there anything significant in your opinion as to the difference in the sizes of the rings and pegs in the game?

"A Yes. I think the main significance is the fact that it's much easier to make the larger ring.

"Q Okay. In your opinion, does that have any significance on the purpose of the larger ring at the conclusion, the conclusionary stage of the game?

"A Yes. I feel the fact that you can make the larger ring easier, it makes it that much easier to complete the game, and then go on with another game, and if people are successful in ringing the peg with the larger ring, why they win their prize, and their customers are more satisfied.

"Q Which of the three stages, Lieutenant, in your opinion, has the predominating influence as far as the outcome of the game.

"A I believe the Bingo portion."

. . . . . . . . . . . . . . . .

"Q Now, under the rules, and from your observation of how the game was played, could anyone come up and simply pay the 25¢ or whatever it was, to get their cards, and not throw any rings?

Defense witness Dr. Robert Dilworth testified that in his opinion the difference in size and weight of the rings had very little effect and skill predominated in the ring throwing portion of RINGO (phases I and III) and that in his opinion skill dominates over chance as to who will win a prize in RINGO. He testified on cross-examination that no one could win a prize without winning at "Bingo" (phase II).

Defense witness Gary Lorden, also a professor of mathematics who participated with Dr. Dilworth in his experiments with RINGO, testified that in his opinion the game of RINGO is predominantly a game of skill. During cross-examination of Dr. Lorden, the following colloquy occurred:

"Q Doctor, isn't the Bingo portion of the game the predominant determiner of who gets to throw those larger rings for the prize?

"A I'll go further than that, and say that it is the absolute determiner of who gets to throw the large rings for the prize. There's no question about it."

Defendant Hagen testified that he had previously operated "Bingo" games at various locations and has been connected with RINGO for about 12 years; that he is proficient in tossing rings over pegs and shows players at "The Pike" the technique in holding the rings. He testified that he "drew up" and originated the game of RINGO but a friend of his (a Harry Lee) had it patented. He denied he had told Officer Welch that no one could operate a RINGO game without his consent and permission and that he (Hagen) had the patent.

On rebuttal, Officer Welch testified that, "He [Hagen] told me that he was there to assist [defendant] Shira in setting up and operating the game of Ringo. He said that he held the patent rights on Ringo; also that he was the owner of a horse race room in Las Vegas, Nevada. He said that he had control over where the game of Ringo would be operated. When questioned regarding his control over the game and not being on the

---

"A Yes.
"Q Did you observe people to do that?
"A Yes. One of my men, Officer Beane, played a game where he didn't throw any rings at all. He just paid his money for the card.
"Q So, in other words, there's no requirement that you had to throw any of the small rings?
"A No."

business license he answered that he held the patent rights and had control over which cities the game would be set up."

ISSUE

The ultimate issue is whether or not the game of RINGO is a lottery. ■ A lottery requires the presence of three elements: (1) a prize, (2) distribution by chance, and (3) consideration (see *Cal. Gas. Retailers* v. *Regal Petroleum Corp.* (1958) 50 Cal.2d 844, 851 [330 P.2d 778]; *Finster* v. *Keller* (1971) 18 Cal.App.3d 836, 843 [96 Cal.Rptr. 241]).

Defendants on appeal do not contest the presence of the first two elements: (1) a prize and (2) distribution by chance. ■ Thus, the determinative issue on appeal is whether or not the third element of consideration is present or absent in RINGO. The issue is raised by defendants' contention that the trial court erred in instructing the jury that:

"In order for the element for consideration to be established in determining whether or not Ringo is a lottery, all that must be proven is that *some* of the players had to pay in order to have a chance at the prize.

"In other words, all that is necessary in order to prove consideration is that in an individual game *some* of the players could not have played the entire game without paying some monetary consideration." (Italics added.)

and by refusing their (defendants') proffered instruction that:

"*If* you find that *there is no requirement in Ringo that every winner of a prize must pay a monetary consideration for the opportunity to have played the game, then the game neither constitutes a lottery nor a prohibited gambling game. . . .* In other words, if the evidence establishes that all players had an opportunity to play the game without charge and that all players had an opportunity to win the prize regardless of whether they had paid for the chance or not, then Ringo is neither a lottery nor a prohibited gambling game." (Italics added.)

A comparison of the above instructions shows that the crux of the dispute is found in the fact that some players of the RINGO game (12 percent) are able to play free of charge while others (88 percent) must

pay for their "Bingo" cards and a chance at the prize. The People's instruction, in essence, told the jury that in order for the element of consideration to exist in a lottery, all that had to be proven is that *"some"* of the players had to pay in order to have a chance at the prize. Defendants' refused instruction, in essence, stated that if there was no requirement in the game that every winner of a prize must pay a monetary consideration for it then the game neither constitutes a lottery nor a prohibited gambling game.

The thrust of defendants' argument on appeal is that the California cases of *People* v. *Cardas* (1933) 137 Cal.App. Supp. 788 [28 P.2d 99]; *People* v. *Gonzales* (1944) 62 Cal.App.2d 274 [144 P.2d 605]; *People* v. *Carpenter* (1956) 141 Cal.App.2d 884 [297 P.2d 498]; and *Cal. Gas. Retailers* v. *Regal Petroleum Corp., supra,* 50 Cal.2d 844, hold that the element of consideration is not present so long as *all* persons participating in the game of RINGO have a *possibility* for a chance at or could win the prize free of charge. They urge that since in RINGO the public at large is offered a red ring free of charge and the 25 cents paid for a white ring and two "Bingo" cards is refunded if the white ring is successfully tossed over the peg that *all* participants have a *possibility* of a chance at and of winning the prize free of charge which removes the element of consideration and therefore RINGO is not a lottery.

Respondent asserts that defendants have misconstrued *Cardas, Gonzales, Carpenter,* and *Regal* and that all that is required to satisfy the element of consideration to constitute a lottery is that *some* of the players of RINGO paid valuable consideration for an opportunity for a chance at winning the prize which is present in RINGO.

## DISCUSSION

*Constitutional and Statutory Law*

The public policy against gambling known as a lottery is well settled being rooted in the California Constitution. Article IV, section 26, enacted in 1908, provided: "The Legislature shall have no power to authorize lotteries or gift enterprises for any purpose and shall pass laws to prohibit the sale in this State of lottery or gift enterprise tickets or tickets in any scheme in the nature of a lottery. . . ." This section was repealed in 1966 and replaced by section 19 which enabled the legislature to regulate horse racing but still provided that "The Legisla-

ture has no power to authorize lotteries and shall prohibit the sale of lottery tickets in the State. . . ."

Penal Code section 319, as cited *supra* in footnote 1, defines a lottery as follows:

"A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift-enterprise, or by whatever name the same may be known." (Enacted 1872.)[9]

The people of California at the primary election held on June 8, 1976, approved an amendment to the Constitution which empowered the California Legislature by statute to authorize cities and counties to provide for "Bingo" games, *but only for charitable purposes.*

The California Legislature implemented the above constitutional amendment by enacting Penal Code section 326.5 authorizing "Bingo" games to be conducted only by *nonprofit, charitable organizations* under stringent conditions and restrictions.

*California Case Law*

The four California cases of *People* v. *Cardas, supra,* 137 Cal.App. Supp. 788; *People* v. *Gonzales, supra,* 62 Cal.App.2d 274; *People* v. *Carpenter, supra,* 141 Cal.App.2d 884, and *Cal. Gas. Retailers* v. *Regal Petroleum Corp., supra,* 50 Cal.2d 844, on which defendants primarily rely, are the only California cases which examined the element of consideration required to establish a lottery. A capsule review of the facts and holdings in those four cases appears necessary.

The *Cardas* case involved a promotional scheme by which defendant theater operator advertised that a prize of two free trips to Santa Catalina

---

[9] The trial court instructed on section 319 as follows:

"A lottery, as defined in the California Penal Code, is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it.

"The name by which the scheme is known or called is immaterial so long as it is a method by which property is distributed or disposed of by chance among persons having paid consideration."

Island would be given to the holders of winning prize tickets. Five thousand prize tickets were distributed with programs in the neighborhood of the theater, and 2,000 were distributed to passing motorists, while others were handed out, to patrons and nonpatrons alike, by an employee stationed in front of the theater. None of the prize tickets were given by the cashier who sold admission tickets to the theater and it was unnecessary to buy an admission ticket to secure a prize ticket or to claim the prize. The stubs from the prize tickets were deposited in a receptacle placed outside the theater by persons who received the prize tickets whether they purchased admission tickets and attended the show or not. The drawing was held on the stage, and the lucky numbers were announced both inside and outside the theater and any person outside the theater who held a winning prize number could enter the theater for the purpose of claiming the prize, without charge. If such a person, however, stayed to see the show, he would be required to pay the regular admission charge.

The appellate department of the superior court in *Cardas* reversed the conviction of the defendant theater operator for having conducted a lottery in violation of sections 320 and 321. The reviewing court held that the question of consideration depends on whether the holders of the tickets paid valuable consideration for chances, and not whether the distributor received something of value for prizes. The question raised was: "Did the holder of prize tickets pay a valuable consideration for the chance?" The court concluded there was no lottery under that factual situation since "those who purchased admission tickets and received prize tickets, . . ., could not be said to have paid a consideration for the prize tickets since they could have received them free." (*People* v. *Cardas, supra,* 137 Cal.App. Supp. at p. 791.)

The *Gonzales* case, similar to *Cardas,* involved a promotional scheme by a theater company which owned and operated five motion picture theaters in Los Angeles. Once every two weeks the company operated a "cash night" drawing, whereby $500 was awarded to a person who held the winning ticket issued by the theater company. The number of the winning ticket was determined by chance in a wheel-spinning process upon the stage of one of the theaters and was announced in the other theaters by an intercommunication system of telephones and loud speakers. If no one in any of the theaters presented a winning ticket within one minute after the first winning number was announced, a second winning number was determined by spinning the wheels in

another theater. The wheel spinning continued in rotation from one theater to another until a winning ticket was presented.

However, in *Gonzales* the details as to the manner of issuing tickets and announcing the winner was unlike *Cardas* in that: (1) the tickets for the prize of $500 on the spin of a wheel were not delivered to anyone who did not pay to enter, the evidence showing that one ticket was delivered at the time admission to a theater was paid and one on leaving, and (2) there were no announcements or participation outside the theater, the winner being required to be in the theater.

In *Gonzales,* the court reversed a conviction for attempted grand theft of theater "cash night" tickets[10] on the ground that all three elements of a lottery were present, including consideration. The court noted that the prosecutor's evidence that the method of distributing the tickets established the inference that defendants could not have accumulated so many tickets consecutively numbered except by stealing from the theater and also established the drawing was a lottery.

The *Gonzales* court distinguished the *Cardas* decision saying, "That decision [*Cardas*] was based upon the fact that there was a general and indiscriminate distribution of the drawing tickets irrespective of whether admission was paid; that attendance inside the theater was not a prerequisite to participation in the drawing; and announcement was made outside the theater for the benefit of non-customers." (*People* v. *Gonzales, supra,* 62 Cal.App.2d at p. 281.)

In respect to the requisite element of consideration to establish a lottery the *Gonzales* court said, "the delayed delivery of another ticket until the person was leaving, was the same as if two tickets had been delivered at the time of paying admission" (p. 280), and it "was therefore a condition that a person pay a consideration, namely, the charge for at least one admission, in order to participate in the drawing." (P. 280.) The court concluded that since "There was no general or indiscriminate

[10]The defendants, sitting in the balcony had suitcases and a box containing 7,643 tickets which were made by the theater company for use by participants in the drawings. All of the tickets were arranged in the suitcases and the box in numerical order and were in various bundles held together by rubber bands, and on the bundles there were index tabs. The numbers on 1,185 of those tickets were not·in consecutive numerical order. The remainder of those tickets, that is 6,458, were in bundles in which the numbers on the tickets were in consecutive numerical order, and some of those bundles contained 250 tickets.

distribution of the drawing tickets to persons irrespective of whether they paid admission" (p. 279), "It was therefore a condition that a person pay a consideration, namely, the charge for at least one admission, in order to participate in the drawing. . . ." (p. 280), and therefore "A valuable consideration was paid for the chance of obtaining such property upon an understanding that it was to be distributed by chance." (P. 278.)

In *Carpenter,* another theater "bank night" case, the court affirmed a judgment of conviction for conspiracy to cheat and defraud and to commit grand theft and grand theft. In that case defendant in conjunction with his confederates won $4,000 on "bank night" by pretending to draw a ticket from a drum but presented a ticket which he had palmed bearing a number assigned to a coconspirator.

The court held defendant could not successfully maintain the game was a lottery and by his own act eliminated the element of chance. In respect to the element of consideration the court held that "under the principles of the *Cardas* case, *supra,* that no consideration was paid for the chance of winning the bank night prize in the instant case." (*People* v. *Carpenter, supra,* 141 Cal.App.2d at p. 890.) This holding was based on the facts that the opportunities to participate in the drawing were given free to anyone desiring to do so; that it was not necessary for a participant to buy a theater ticket to win a prize; that anyone desiring to be present at the time of the drawing could go in without paying admission to claim the prize; and the names of winners were announced over microphones both inside and outside the theaters.

We now turn to *Regal,* the leading and controlling California case. The Supreme Court in *Regal* made an in-depth analysis and examination of the facts and holdings of *Cardas, Carpenter,* and *Gonzales,* and held the promotional and advertising scheme involved in *Regal* did not constitute a lottery.

The manner in which the *Regal* case came before the court and the factual background are important to an understanding of its teachings.

In *Regal* plaintiff California Gasoline Retailers, a nonprofit California corporation consisting of members distributing the products of the major oil companies (Standard Oil, Shell Oil, Union Oil and others) sought to enjoin defendants, who were members of three groups (the Regal group, Norwalk group and Beacon group) of independent service station

operators, from engaging in an advertising and merchandising giveaway program alleged to constitute a lottery.

The three groups of independent service stations (defendants) operated their advertising and merchandising giveaway scheme in a similar manner. The prizes consisted of automobiles, household appliances and cash. All three groups made wide distribution of the tickets free of charge to the public which was not dependent upon purchases of gasoline or other services from the participating stations. Tickets were distributed at the service stations before and after purchases, house to house, at drive-in theaters, at baseball games, and under windshield wipers of parked cars. Basically, the stubs had to be deposited at the stations, the winner did not have to be present at the drawing, and all winning numbers were posted at the participating stations for a seven-day period after the drawing. The Norwalk and Beacon groups advertised extensively in newspapers, over the radio and by billboards and to defray expenses of the campaign increased the price of gasoline by one cent per gallon which was passed on to consumers.

The *Regal* court reversed portions of plaintiff's judgment concluding that defendant's advertising and promotional scheme did not fall within the definition of a lottery as set forth in section 319 because of lack of consideration.

The court rejected the People's argument that the element of consideration is established by showing that the defendant received something of value in return for the distribution of the prizes. The Supreme Court reaffirmed that the question of consideration is not to be determined from the standpoint of the defendant, but from that of the holders of the prize tickets as construed in *Cardas* and *Carpenter*. The court stated that: ". . . in view of the plain provisions of section 319 of the Penal Code, in order to constitute consideration within the definition of a lottery there must be a valuable consideration paid, or promised to be paid *by the ticket holder*." (*Cal. Gas. Retailers* v. *Regal Petroleum Corp., supra,* 50 Cal.2d at p. 862.)

The Supreme Court stated that: "If *any* person could receive a ticket or tickets without paying anything therefor, it would appear that the question of consideration should not rest on the percentage of those receiving tickets *with purchases* as opposed to those receiving tickets *without* such *purchases*" (p. 859) (italics added), and "Since it clearly

appears from the record that *any* person could have received a ticket, or tickets, free for the asking, or even without a request and without any necessity of making any kind of *purchase* . . ." (p. 858) (italics added) the promotional and advertising schemes of the independent gasoline station operators did not constitute a lottery.

It is the above language in *Regal* and the words *"any* person" that the appellants-defendants and respondent in the case at bench both point to as supporting their respective contentions on appeal.

We conclude that defendants' reliance on the cases of *Cardas, Gonzales, Carpenter,* and *Regal* is misplaced in that they are factually distinguishable and a careful analysis of their holdings does not comport with the construction urged by defendants.

*First:* An obvious important factual distinction between the above referred to cases which found a lottery did not exist and the case at bench is that they involved promotional schemes by using prize tickets to increase the purchases of legitimate goods and services in the free market place, i.e., theater tickets (*Cardas* and *Carpenter*) and gasoline and service from filling stations (*Regal*). While here, the RINGO game is conducted as a business and the game itself is the product being merchandised. The prize tickets referred to in *Cardas, Gonzales, Carpenter,* and *Regal,* by analogy, are in RINGO the "Bingo" cards which the trial jury, supported by substantial evidence, found to be predominantly a game of chance. Thus, the product being merchandised is in no way comparable to the promotion of theater ticket or gasoline sales. The payment of 25 cents in RINGO in exchange for a small white ring and two "Bingo" cards is not a *purchase* as such because the player is not entitled to keep the ring or the cards. It is a *wager*.

*Second:* We disagree with defendants' argument that *Cardas, Gonzales, Carpenter,* and *Regal* support their contention that there is an absence of the element of consideration in RINGO. They specifically refer to the language in the *Regal* case which says that if *"any person* could have received a ticket, or tickets, free . . ." and assert it means that consideration is not established where there is a *possibility* that "any" *one* person could play free pointing to the 12 percent of the players who can successfully toss a small ring over a peg and receive two "Bingo" cards free of charge.

The language and holdings in *Cardas, Gonzales, Carpenter,* and *Regal* which have hereinbefore been set out in some detail must be considered as a group and construed realistically in light of the factual circumstances involved in each of those cases. ■ We construe the implicit holdings of those four cases to be, as they pertain to the presence or absence of the element of consideration, that in order for a promotional giveaway scheme to be *legal any* and *all* persons must be given a ticket free of charge and without any of them paying for the opportunity of a chance to win the prize. Conversely, a promotional scheme is *illegal* where *any* and *all* persons *cannot* participate in a chance for the prize and *some* of the participants who want a chance to win must pay for it.

In *Cardas, Carpenter,* and *Regal* the schemes lacked the element of consideration and were *legal* because there was a general and indiscriminate system of distribution of the drawing tickets and the money paid by the patrons for the admission ticket to the theater or for gasoline was no more than consideration for viewing the movie or for the gasoline itself. The element of consideration in the promotional scheme in *Gonzales* and the scheme were *illegal* because there was not a general and indiscriminate distribution of the drawing tickets and money paid for an admission ticket to the theater also constituted consideration paid for the chance at the prize.

■ The controlling distinction between the above referred to cases and the game of RINGO is that in RINGO *any* and *all* persons *cannot* participate in the chance to win the prize without payment of consideration. In RINGO in order to win the offered prize a player *must* hold a prize ticket which is a "Bingo" card and without that "Bingo" card no one has a chance of winning. Only the winner at "Bingo" ever wins the prize. Only 12 percent of those who may be successful in throwing the small rings over the peg obtain two "Bingo" cards free and a chance at the prize without payment of consideration. The chance to win the prize is not open to *any* person without the payment of consideration. The vast majority of the players (88 percent) who cannot successfully toss the small rings over the peg must pay a valuable consideration (25 cents) for a chance to win the prize. There was also testimony that "Bingo" cards could be purchased for 25 cents without even participating in the small ring tossing portion of the game.

In the game of RINGO defendants would have to do what the operators did in the *Regal, Cardas,* and *Carpenter* schemes to render the

game legal and that is to make a general and indiscriminate distribution of "Bingo" cards (the prize tickets) free to *any* and *all* who asked for one and then permit those persons to participate and claim the prize if they won. This they did not do.

■ Moreover, our analysis of *Cardas, Carpenter, Gonzales,* and *Regal* as discussed above is in complete harmony with "the salutary rule which requires strict construction of penal statutes," but does not require "that a penal statute be strained and distorted in order to exclude conduct clearly intended to be within its scope" it being "sufficient if the words are given their fair meaning in accord with the evident intent of [the legislature]." (*United States* v. *Raynor* (1938) 302 U.S. 540, 552 [82 L.Ed. 413, 420, 58 S.Ct. 353].)

The logic and reasonableness of the language in *State* v. *Mabrey* (1953) 245 Iowa 428 [60 N.W.2d 889, 893], is persuasive where the court said:

"[T]he game here was a lottery at least as to those who purchased tickets. It did not cease to be a lottery because some were admitted to play without paying for the privilege, so long as others paid for their chances. Presence of the nonpaying participants did not change the status of those who paid. *If it was a lottery as to some who played the game it was nonetheless a lottery.* [¶] Unless we close our eyes to reality the conclusion is justified that in actual operation ticket purchasers—perhaps unwittingly—paid for their own chance at prizes and also for the chance of those who were admitted to the game without paying. Thus presence of the nonpaying participants did not change the essential character of the enterprise. Indeed, as several courts have pointed out, opening a lottery to nonpaying participants is, in a sense, all the more objectionable in that it reduces the chance for the prize of those who pay therefor and would seem to be entitled to it." (Italics added.)[11]

■ Thus, it becomes clear in the instant case that if some of the players of RINGO had to pay in order to have a chance at the prize or

---

[11]See also: *Commonwealth* v. *Wall* (1936) 295 Mass. 70 [3 N.E.2d 28, 30], which stated:
"[A] game does not cease to be a lottery because some, or even many, of the players are admitted to play free, so long as others continued to pay for their chances." and *McFadden* v. *Bain* (1939) 162 Ore. 250 [91 P.2d 292, 295], where the court said:
"To constitute a lottery, it is not necessary for all participants to pay for their chances, but it is sufficient if some do though many do not pay a valuable consideration. The legal effect of the transaction is not changed by the fact that some do not pay."
(See also *State* v. *Eames* (1936) 87 N.H. 477, 480-481 [183 A. 590, 592].)

conversely if some of the players could not have played the entire game without paying some monetary consideration the element of consideration is established with regard to a violation of section 319.

Here the fact is that the great majority who play RINGO, 88 percent, must pay something of value (25 cents) for the "Bingo" cards (the prize tickets) and the opportunity for a chance at the prize which satisfies the element of consideration necessary to establish an illegal lottery under section 319.

*Finally:*

" 'It is said in 34 American Jurisprudence 650 "that no sooner is the term 'lottery' defined by a court, than ingenuity evolves some scheme within the mischief discussed, although not quite within the letter of the definition given; but an examination of the many cases on the subject will show that it is very difficult, if not impossible, for the most ingenious and subtle mind to devise any scheme or plan, short of a gratuitous distribution of property, which has not been held by the courts of this country to be in violation of the lottery laws. . . . The court will inquire, not into the name, but into the game, however skillfully disguised, in order to ascertain if it is prohibited. . . ." ' " (*Cal. Gas. Retailers* v. *Regal Petroleum Corp., supra,* 50 Cal.2d at p. 859.)

In *Finster* v. *Keller, supra,* 18 Cal.App.3d at page 842, footnote 1 (petn. for a hg. by the Supreme Court den. Oct. 6, 1971), the court said:

" 'In determining whether the contract is in the nature of a lottery, we look, not to the name, but the game. Courts will not tolerate subterfuge, however ingenious may be the scheme devised to evade the law.' . . . (*National Thrift Ass'n.* v. *Crews,* 116 Ore. 352 [241. P. 72, 73, 41 A.L.R. 1481, 1483-1484].)"

We conclude, as did the trial jury below, after examining all three phases of the RINGO scheme and taking cognizance of the three requisite elements to constitute a lottery that, viewed realistically, the game of RINGO is an ingenious but transparent attempt to circumvent the lottery laws of California.

It is clear from *Cardas, Carpenter,* and *Regal* that, while it may be legal to make a gift or a "gratuitous distribution of property" where the recipient is selected by chance, under the circumstances therein prevailing one may not obtain immunity from prosecution under section 319 by

resorting to the device of a "sham" or "pretended" gift. When placed into proper perspective with all three phases of RINGO as an integrated game, the subterfuge of giving the players the small red ring free of charge realistically takes on the character of a "pretended" or "illusionary" gift in order to induce or lure players to play the game when considering that 12 percent of the players who could successfully encircle the free small rings over the pegs still have to clear two hurdles before winning the prize, i.e., win at "Bingo" and successfully toss one of the large three rings over a peg. When once seated the low cost of playing (25 cents) entices the participants to continue playing if they are unsuccessful at the small red ring. The record does not disclose what percentage of the 12 percent who successfully toss a small red ring over a peg actually win the prize but logic indicates it would be a relatively small fraction of the 12 percent, and at least the 88 percent who did pay for a chance at winning the prize made it a profitable enterprise for defendants.

Thus, by the clever injection of skill aspects of tossing rings over pegs, giving a free red ring to the public at large and the use of the descriptive name "RINGO" defendants have attempted to camouflage the dominate chance aspects of RINGO found in the "Bingo" cards. We conclude that while the name of the game is RINGO, the game "Bingo," one purely of chance, dominates.[12]

The evidence of the dominance of "Bingo" in RINGO is found not only by the testimony of Officer Welch, but in the fact that the *only point* in the integrated three-phase RINGO game where valuable consideration passes from the players to the operator defendants is in phase II when the vast majority (88 percent) of the players pay the 25 cents before

---

[12]The trial judge instructed the jury on skill and chance as follows and the jury by its verdict found that chance, not skill, dominates in Ringo:

"In determining whether the game of Ringo is a lottery as defined in Penal Code § 319, it is not material that it may or may not contain an element of skill. The test is not whether the game contains elements of chance or skill, but which of them is the dominating factor in determining the final result of the game.

"It is the overall character of the game that determines whether the game is one of chance or skill and not a particular player's skill or lack of it. (*In re Allen* (1962) 5 C.2d 5, 6; *People* v. *Settles* (1938) 29 C.A.2d.Supp. 781.)"

"Skill is defined as the knowledge of the means or methods of accomplishing a task; the ability to use one's knowledge effectively and readily in execution or performance; dexterity or coordination in the execution of learned physical or mental tasks; a learned power of doing a thing competently; a developed or acquired aptitude or ability; a coordinated set of actions which become smooth and integrated through practice. (*Webster's Third New International Dictionary*, unabridged, 1965.)"

"Chance is defined as: 'Something that happens unpredictably without any discernible human intention or direction and in dissociation from any observable pattern.' (*Webster's Third New International Dictionary*, unabridged, 1965.)"

receiving the "Bingo" cards along with one white ring; that no prizes were given for making the small red or white ring which, in essence, merely determines the cost of the "Bingo" cards; that no one had to throw the small rings; that "Bingo" cards could be purchased without first tossing the small rings; that no one was permitted to play in phase II who did not either purchase the "Bingo" cards or was successful in tossing one of the small rings over a peg (phase I); that no one was permitted to have a "Bingo" card free for the asking, i.e., a person could not simply go in and ask for a "Bingo" card and commence to play the second phase of the game; and that only those who possessed "Bingo" cards and won at "Bingo" had an opportunity or chance at the prize.

"Bingo" and its variations in the game Canasto-O, Black-Out, Vogue, Jade, Cameo, Shamrock, Skill Quiz, Lecture, Skill Quiz Game, and oral Klu Quiz Game[13] have been held to be games in which chance rather than skill determines the possibility of winning and illegal lotteries under article IV, section 26 of the California Constitution and Penal Code section 319. (See 17 Ops.Cal.Atty.Gen. 63.)

Although, as previously noted, California constitutional and statutory law presently authorize "Bingo" games *only* for *nonprofit, charitable organizations* under stringent conditions, the record indicates that defendants would not qualify as an eleemosynary institution and operated the game for a profit, defendant Shira having gone to great lengths to obtain a license[14] and having paid the City of Long Beach $5,700 for a business license to operate the game.

CONCLUSION

■ ■■■ Accordingly, by reason of the foregoing, we conclude: (1) that there is no binding California precedent supporting defendants'

---

[13]Canasto-O players have cards with 65 symbols. The object is to complete a row of five contiguous symbols, played by individual players throwing a ball in one of 65 cups which denotes a symbol and card to be covered. Prior to the game eight symbols are announced as "joker" symbols usable to all players.

Black-Out, Vogue, Jade, Cameo, and Shamrock players attempt to complete cards bearing symbols so that a card has a contiguous line of five completed symbols, the first five balls are "game balls" or wild balls which any player may use to complete his card, each player may only win or lose by virtue of his own throws of ball into cups with symbols corresponding to symbols on a game card.

Skill Quiz, Lecture, Skill Quiz Game, and Klu Quiz Game players attempt to fill rows on the card and the winning player is asked a quiz question for the correct answer to which he receives a prize, and after such question a house question is asked of all players for which an identical prize is given to the person giving the correct answer. (See 17 Ops.Cal.Atty.Gen. 63.)

[14]See footnote 6, *ante*, page 446.

contention; (2) that the trial court's jury instructions on the element of consideration correctly stated the law and the defendants' proffered instruction on that issue was properly refused; (3) that the evidence supports the jury's finding that the element of consideration necessary to constitute a lottery is present in the game called RINGO; and (4) that the RINGO game is an illegal lottery being in violation of section 319.[15]

## DISPOSITION

The judgments of conviction, and each of them, are affirmed.

Lillie, Acting P. J., and Thompson, J., concurred.

A petition for a rehearing was denied October 25, 1976, and appellants' petition for a hearing by the Supreme Court was denied December 2, 1976.

---

[15]Defendants on appeal also contend the Long Beach Municipal Code section 4140.7 required the element of consideration to establish violations of the code. Since we have concluded that the element of consideration is present in the game of RINGO and that it is an illegal lottery in violation of state law (section 319), we need not address that contention in detail.

Nor do we address defendants' contention on appeal that the police activity constituted discriminatory law enforcement. Defendants incorporate by reference their written brief filed with the appellate department of the superior court on this issue. The brief contends the trial court improperly denied defendants' motion for admission of evidence on the defense of discriminatory law enforcement which deprived them of a fair trial based on *Murguia* v. *Municipal Court* (1974) (Cal.App.). The reporter's transcript shows defendants did not raise the issue through a pretrial motion to dismiss but by way of a motion to admit evidence in the trial of the matter and the alleged discriminatory law enforcement was on the basis of infringing on defendants' right to engage in business. The trial court denied the motion on the ground that defendants have no fundamental right to engage in an unlawful business as it is only the right to engage in a lawful business which is protected by the Constitution.

The Supreme Court granted a hearing on the *Murguia* Court of Appeal case after the verdict in the instant case was returned and subsequently rendered its opinion in *Murgia* [*sic*] v. *Municipal Court* (1975) 15 Cal.3d 286 [124 Cal.Rptr. 204, 540 P.2d 44]. Therefore, the *Murguia* Court of Appeal decision is not binding and became a nullity and of no force or effect as an authoritative statement of the principle of law described therein when the Supreme Court granted a hearing. (*Knouse* v. *Nimocks* (1937) 8 Cal.2d 482 [66 P.2d 438].)

The Supreme Court decision of *Murgia* [*sic*] v. *Municipal Court, supra,* a discovery case, (pertaining to consolidated misdemeanor proceedings emanating from picketing and organizational activities by union members) held that the issue of alleged discriminatory prosecution is to be resolved by the court, rather than the jury, and it should not be resolved on evidence submitted at trial, but should be raised through a pretrial motion to dismiss and must demonstrate that defendant[s] were deliberately singled out for prosecution on the basis of "invidious discrimination." We cannot reach defendants' contention on appeal as to the applicability of this decision as the record on appeal does not contain an adequate showing of an intentional and purposeful singling out of defendants for prosecution on an "invidious discrimination" basis.