[Crim. No. 3738.   Second Dist., Div. Three.   Jan. 12, 1944.]

THE PEOPLE, Respondent, v. TONY GONZALES et al.,
Appellants.

Anna Zacsek for Appellants.

Robert W. Kenny, Attorney General, and T. G. Negrich, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendants were accused by information of the crime of attempted grand theft, in that they feloniously attempted to take $500 in money, the property of the Metropolitan Theaters, Inc. Trial by jury was waived. Defendants were convicted, and they appeal from the judgments and the orders denying their motions for a new trial.

The Metropolitan Theaters, Inc., hereinafter referred to as the theater company, owned and operated 5 motion picture theaters in Los Angeles. On June 30, 1942, the date of the alleged offense, and once every two weeks for more than a year prior thereto, at a designated time, the theater company operated at its theaters a drawing known as "cash night" drawing, whereby $500 was awarded to a person who held the winning ticket issued by the theater company. The number of the winning ticket was determined by chance in a wheel-spinning process upon the stage of one of the theaters. Details as to the manner of issuing the tickets and determining the winning number will be stated hereinafter.

On the night of June 30, 1942, which was a regular date for a "cash night" drawing, Basile and his wife were in one of the theaters sitting side by side in the last row of patrons' seats in the balcony during the operation of the drawing. The winning number was determined by spinning the wheels and was announced from the stage. Basile held the winning ticket. He handed the ticket to his wife and she handed it to one Slater who occupied the seat next to her and asked him to present it. Slater took the ticket and shouted, "Here!" The paymaster of the theater than went to Slater, who was in the balcony, and read aloud the number on the ticket held by Slater. The master of ceremonies, an employee of the theater company who was on the stage directing the drawing, announced that the number was correct and requested the paymaster to bring Slater to the stage. Slater and the paymaster then went upon the stage and the master of ceremonies congratulated Slater, handed a card to him upon which Slater's name and the winning number were written, and told Slater that the paymaster would take

him to one of the other theaters where the $500 would be paid to him. Thereupon they left the stage and the drawing for that evening was closed.

A patron of that theater, who sat near Basile, Mrs. Basile, and Slater, observed that Basile had two suitcases and that Mrs. Basile had a cardboard box, and during the drawing Basile was looking in the suitcases and box at what appeared to be many "cash night" tickets. The patron observed further that Basile took a ticket from among those in the cardboard box and handed it to Mrs. Basile who handed it to Slater. The patron told an employee of the theater what he had observed concerning Basile.

The manager of the 5 theaters thereupon interviewed Basile, Mrs. Basile, and Slater in the office of the theater. The suitcases and the box contained 7643 tickets which were made by the theater company for use by participants in the drawings. All of the tickets as arranged in the suitcases and the box were in numerical order and were in various bundles held together by rubber bands, and on the bundles there were index tabs. The numbers on 1185 of those tickets were not in consecutive numerical order. The remainder of those tickets, that is 6458, were in bundles in which the numbers on the tickets were in consecutive numerical order, and some of those bundles contained about 250 tickets.

Basile told the manager of the theater that defendant Gonzales, who was the janitor at one of the theaters, had been giving tickets to him. A police officer testified that Gonzales said: that he had given tickets to Basile on numerous occasions; that he had taken the tickets from the box office of the theater; and that he was to get one-third of the winnings. Gonzales was not present at any of the theaters on the night of June 30, 1942.

The case was submitted to the trial court upon the transcript of the preliminary examination. Defendants did not testify, and called no witnesses.

Defendants contend that the "cash night" drawing conducted by the theater company was a lottery, and that, even if it be conceded that the winning ticket had been stolen, an attempt to obtain the prize money solely by the presentation of a stolen lottery ticket was not attempted theft.

Section 319 of the Penal Code provides in part as follows: "A lottery is any scheme for the . . . distribution of prop-

erty by chance, among persons who have paid . . . any valuable consideration for the chance of obtaining such property . . . upon any agreement, understanding, or expectation that it is to be distributed . . . by lot or chance, whether called a lottery, raffle, or gift-enterprise, or by whatever name the same may be known.''

■ The elements of a lottery as stated in that definition were present in the case before the court, as shown by the foregoing references to the evidence.

There was a scheme for the distribution of property. A prize of $500 had been awarded to the holder of the winning ticket on the many previous ''cash night'' drawings, and a prize in the same amount was offered at the drawing involved herein.

The distribution of the property was by chance. The winning number at the drawing, which determined the identity of the person to whom the distribution would be made, was ascertained by chance as shown by the following: The numbers on the tickets used at the drawing were of 6 digits. On the stage of each of the 5 theaters there were 3 wheels so installed that the master of ceremonies at the drawing could spin them. The front wheel, known as the pellet wheel, contained pellets upon each of which a number of 3 digits was written. The first 3 numbers, or the thousandths numbers, of the winning number were the three numbers on the pellet which would fall out of the pellet wheel when it was spun. The second wheel was back of, and smaller than, the pellet wheel. The fourth, or hundredths number, of the winning number was the number indicated on the second wheel by an arrow after the spinning of that wheel. The third wheel was back of, and larger than, the other two wheels. The last 2 numbers, or the tens and units numbers, of the winning number were the numbers indicated on the third wheel after the spinning of that wheel. After a winning number was determined by spinning the wheels in one of the theaters, the number was announced in the other theaters by an inter-communication system of telephones and loud speakers. If no one in any of the theaters presented a winning ticket within one minute after the first winning number was announced, a second winning number was determined by spinning the wheels in another theater. The wheel spinning continued in rotation from one theater to another until a winning ticket was presented.

A valuable consideration was paid for the chance of obtaining such property upon an understanding that it was to be distributed by chance. The period of time for which the "cash night" tickets were considered valid by the theater company for participation in the drawings was 6 weeks. Approximately 30,000 tickets were issued each week, and therefore about 180,000 tickets were outstanding during each 6 weeks' period. At the trial herein 47 persons, being practically all of those who were employed as cashiers, usherettes, closing men, and managers, at some time during the 6 weeks preceding June 30, 1942, were called as witnesses by the prosecution. Twenty-six cashiers, 8 usherettes who were also cashiers, 7 closing men, 4 managers, 1 master of ceremonies, and the general manager of the 5 theaters testified that, under instructions by the theater company, only one "cash night" ticket was delivered to each patron at the time he paid the regular and usual charge for admission to one of the theaters; and that another "cash night" ticket was given without charge therefor to each patron as he was leaving the theater. The general manager also testified that his instructions to the employees were that if a patron in leaving the theater asked for tickets in addition to the one handed to him, it should not be given unless the employee ascertained there were others in the patron's party, and then to give only one ticket for each person in the party; that the employees, including the janitors, were instructed to pick up every drawing ticket which the patrons dropped in the theaters, the entrances thereto, or the sidewalks in front thereof, and return them to the box office; and that the employees were instructed to "try to get every one" of the tickets which were dropped by patrons, but "if patrons get there first" to pick up a ticket the employee should not make trouble about it.

The general manager testified further, after having stated that tickets were given to patrons only at the time they paid admission and at the time they were leaving the theater, as follows: "You misunderstood that modification I just mentioned. I said a customer asking for a ticket without purchasing an admission, they could receive a ticket gratuitously."

It is to be noted that the general manager, in modifying his previous testimony, used the word "customer" in

designating the class of person who should receive a ticket "gratuitously," if he asked for it. The use of the word "customer" indicates that a person to whom a "free" ticket might be given, for the asking, was a person who had paid admission at some time. The record does not show that any ticket was delivered by the theater company to any person or "customer" for the asking, or at all, who did not pay admission. There was no announcement by sign or otherwise, outside or inside the theater, that drawing tickets would be given gratuitously to "customers" or other persons if they would ask for them, or that such tickets would be given gratuitously at all. Even if a drawing ticket were given "gratuitously" as related by the general manager, it does not appear that the winning number was announced outside the theater for the benefit of such a person who had not paid admission, or announced outside the theater at all. Furthermore, it does not appear that any provision was made whereby such a "customer" who held the winning ticket could enter the theater to claim the prize without paying the admission charge, if by some means he had been notified that he held the winning ticket.

There was no general or indiscriminate distribution of the drawing tickets to persons irrespective of whether they paid admission.

Respondent cites several excerpts from the testimony to the effect that tickets were given free to persons as they were leaving the theaters, and that those persons dropped many of the tickets on the theater premises. Counsel for respondent argues, in support of his contention that there was an indiscriminate and free distribution of the drawing tickets, that such evidence shows the tickets were generously distributed and carelessly handled; that the persons finding such dropped tickets could hand them to friends who could use them when they attended a subsequent "cash night" drawing, and therefore the owner of a winning ticket need not be a patron at all or part with anything of value for the ticket. It is to be observed, however, that such distribution (as the patrons were leaving) was made in the theaters, and consequently was made only to persons who had previously paid admission to enter the theaters, and therefore was a distribution to persons only who by reason of such payment were in a position to receive the alleged "free" tickets. In

other words, insofar as the substance of the method of distribution was concerned, the delivery of a ticket at the time admission was paid, and the delayed delivery of another ticket until the person was leaving, were the same as if two tickets had been delivered at the time of paying admission. It is to be observed also that the careless handling, if any, of the tickets was not by the theater company, but by the patrons—those who had received the tickets at the time of, or after, paying admission, and therefore the asserted carelessness by the patrons in dropping the tickets was not an indiscriminate distribution of the tickets by the theater company. On the contrary the theater company was careful and diligent in its efforts to obtain dropped tickets before patrons or others picked them up. In view of the theater company's efforts to prevent distribution by the dropped ticket method, certainly a substantial number of the tickets was not distributed even by that method, but the number so distributed was negligible. It is to be noted that even the dropped tickets, which respondent contends were distributed by the theater company, were tickets that had been delivered to the patrons, who dropped them, only when or after those patrons had paid admission. Furthermore, if a person picked up a dropped ticket and gave it to a friend to be used at a subsequent drawing, as respondent suggests, the friend would be required to pay admission in order to enter the theater and participate in the drawing.

It is clear that drawing tickets were not delivered by the theater company to anyone who did not pay to enter the theater, and that anyone who held a ticket and desired to participate in the drawing was required to be in the theater and therefore was required to pay admission. It was therefore a condition that a person pay a consideration, namely, the charge for at least one admission, in order to participate in the drawing.

Of course, it does not appear expressly that the trial court found there was an indiscriminate distribution of the drawing tickets irrespective of whether admission was paid. This court, however, would not be bound by such a finding inasmuch as there was no evidence to support such a finding. The only evidence which might be considered as contra to the testimony of the 47 employees of the theater, to the effect that 2 drawing tickets only were given to each patron—one when he entered and one when he left the theater, was

the qualifying statement made by one of those witnesss (after he had testified the same as the other 46 witnesses had testified) when he said that a ticket would be given to a "customer" gratuitously if he asked for it. Literally that statement referred to a person who had paid admission at some time. If it be considered, however, that the witness used the word "customer" inadvertently when he intended to say "person," such qualifying statement did not present a substantial conflict in the evidence as to the method of distribution. The record does not show that any person who had not paid admission asked for, or was given, or was offered a drawing ticket by the theater company. Even if the evidence had shown that drawing tickets were distributed to "persons" gratuitously in accordance with the qualifying statement of that witness, it would not have presented a conflict in the evidence which would have supported a finding that there was an indiscriminate distribution of tickets to persons irrespective of whether they paid admission, unless such distribution to non-customers was of a substantial number of tickets in relation to the 180,000 tickets issued to customers for each six weeks' period. The distribution of a negligible number of tickets to non-customers would not have presented a substantial conflict in the evidence.

Apparently the only reported case in this state involving the question whether a theater "cash night" drawing was a lottery is the case of *People* v. *Cardas* (1933), 137 Cal. App.Supp. 788 [28 P.2d 99], wherein it was held that the drawing involved therein was not a lottery. That decision was based upon the fact that there was a general and indiscriminate distribution of the drawing tickets irrespective of whether admission was paid; that attendance inside the theater was not a prerequisite to participation in the drawing; and announcement was made outside the theater for the benefit of non-customers. The method of distributing the prize tickets in that case was different very materially from the method of distribution herein. Defendant therein, an operator of a motion picture theater, advertised that a prize would be given at the theater to the holder of the lucky ticket. The tickets were delivered to the public by distributing, in the vicinity of the theater, 5,000 theater programs, each containing one of the tickets, and handing 2,000 tickets to passing motorists, and giving the tickets to pedestrians

who came near the theater. No charge was made for such tickets so distributed and it was not necessary that an admission ticket be purchased. The cashier sold only admission tickets, and did not deliver any of the prize tickets or have any of them in her possession. There was a sign out-side the entrance to the theater which stated that the holder of the winning number was entitled to enter the theater, without charge, to claim the prize. The court said on page 791: "Certainly those who received prize tickets without buying an admission ticket did not pay anything for the chance of getting the prize." In that case the court cited with approval the case of *Cross* v. *The People etc.* (1893), 18 Colo. 321 [32 P. 821, 36 Am.St.Rep. 292], wherein it was held that the drawing was not a lottery. In the Colorado case persons holding tickets, although not present, were entitled equally with those present at the store to win the prize, and it was stated in that case at page 325: "These tickets, or chances, were given indiscriminately to persons whether they purchased goods of plaintiff in error or not—to those who registered their names at their shoe store, and to those, who, from a distance, sent the return postage."

In *State* v. *Danz* (1926), 140 Wash. 546 [250 P. 37, 48 A.L.R. 1109], the statute there involved, relative to lottery, was substantially the same as section 319 of the Penal Code of this state, relative to lottery. Defendant therein, who operated a motion picture theater, distributed groceries and other articles from the stage of the theater to the holders of winning tickets. The articles distributed did not cost the defendant anything but were obtained from various merchants whose names were mentioned as the articles were distributed. On the night of each drawing each adult patron, upon paying the admission charge, received a drawing ticket. There was a sign at the front of the theater stating that the drawing tickets were free and it was not necessary to purchase tickets to the theater. The evidence showed, however, that no ticket was given unless admission was paid. Announcement of the winning number .was made outside the theater, and anyone outside who held a winning ticket had the right to enter the theater without charge to claim the prize. The court said at page 548: "Manifestly, it was the plan and purpose of the appellants to get additional money by putting on the chance drawing. The testimony shows it

was put on as an additional drawing card. The patrons knew it was 'country store' night. They paid a valuable consideration to participate. The fact that they paid the same price charged on other nights, when the theater was running a more popular play without an added attraction, is not conclusive or controlling in favor of the appellants. A valuable consideration was paid. What did the purchaser get? Not simply a ticket for the screen show, but a ticket to that and to the chance drawing. The appellants and their patrons so understood and intended it. That was the plan and purpose for which the consideration was paid. Nor is the fact that free tickets were offered to outsiders material in any controlling sense. None such was given out as a matter of fact and, if there had been, it would not of itself have made any difference.'' Apparently the explanation of the last statement just quoted, to the effect that if free tickets had been given to noncustomers it would *not of itself* have made any difference, was that if the free distribution to noncustomers was negligible as opposed to a general free distribution of a substantial number of tickets to noncustomers it would not have made any difference.

In *People* v. *Cardas, supra,* 137 Cal.App.Supp. 788, it was said at page 792: ''An examination of the cases holding certain schemes, apparently somewhat similar to the one here in question, to be lotteries, discloses vital points of distinction. In general they fall into two groups. In one group it will be found that the prize tickets were only furnished to customers—those who purchased something. The payment made by the customer was for both the articles purchased and the prize ticket—part of the consideration was for the ticket. [Citing cases.] . . . The decisions, however, are not entirely uniform in holding even such a scheme to be a lottery. [Citing a Mississippi case which held it not to be a lottery.] . . . In the other group, it will be found that while the distribution of prize tickets purported to be both to noncustomers as well as customers, in fact the distribution to the former class was negligible. *Featherstone* v. *Independent Service Station Assn.* (Tex. Civ. App.), 10 S.W.2d 124, is typical of this group, where there was no general free distribution of the tickets to the public as in the case at bar.''

It therefore appears that the three elements of a lottery specifically referred to above, and generally referred to

as (1) the giving of a prize, (2) by a method involving chance, (3) for a consideration paid by the participant (*Darlington Theatres, Inc.* v. *Coker* (1939), 190 S.C. 282, 291 [2 S.E.2d 782]), were present in this case. The "cash night" drawing involved herein was a lottery. (See also annotation, 103 A.L.R. 866-872.)

■ It seems that the prosecution made the extensive showing as to the method of distributing the tickets, in order to establish a basis for an inference that it was not reasonably probable, under the theater company's restricted method of distribution to its patrons only, that Basile could have accumulated so many tickets in such large groups of consecutively numbered tickets, except by stealing them from the theater company. The evidence which established that inference also established that the drawing was a lottery.

■ The Constitution of California, article IV, section 26, provides in part: "The Legislature shall have no power to authorize lotteries or gift enterprises for any purpose and shall pass laws to prohibit the sale in this state of lottery or gift enterprise tickets or tickets in any scheme in the nature of a lottery." Section 320 of the Penal Code provides in part: "Every person who contrives, prepares . . . or draws any lottery, is guilty of a misdemeanor." The "cash night" drawing herein was unlawful.

Although Basile had many tickets which were stolen, he also had tickets which he received at the times he paid the admission charges on the evening of the drawing and on previous occasions during the preceding six weeks' period. Whether the winning ticket was one of those issued to him by the theater company when he paid admission, or was one given to him by someone who had received it when an admission charge was paid, or whether it was one given to him by someone who had stolen it, or whether he had stolen it, or whether it was one he had picked up after a patron had dropped it, or whether he obtained it in violation of any of the various rules of the theater company as to the manner of obtaining tickets, were questions of fact for the trial court. There was testimony that the winning ticket, No. B477462, was in a bundle of tickets held by Basile, in which the tickets were in consecutive numerical order from No. B477431 to and including No. B477475. Of course, the finding of the court as to the manner in which Basile obtained the win-

ning ticket does not appear expressly. It is not necessarily an implied finding that it was a stolen ticket. It will be assumed, however, that the court found it was a stolen ticket, particularly in view of appellants' contention on appeal which is based upon the assumption that it was stolen.

Respondent has not replied to appellants' contention that an attempt to obtain the prize money solely by the presentation of a stolen lottery ticket was not attempted theft, other than to reply that the drawing was not a lottery. Respondent's reply was that the drawing was not a lottery; that no consideration was paid and no element of chance was involved since the holder of a drawing ticket paid nothing for it; that the number drawn was announced by loud speaker outside the theater; that it was not a prerequisite that the holder of the winning ticket be in attendance; and that the opinion in *People* v. *Cardas, supra,* is determinative that the drawing herein was not a lottery. Respondent asserts further that if the decision in *People* v. *Cardas* is not the law and is not followed, then the judgment and order in the present case should be reversed. Although these points have been discussed hereinbefore, it should be noted here: (1) that the record does not show that the number drawn was announced outside the theater; (2) that the record does not show it was not a prerequisite that a ticket holder be in attendance; (3) that respondent, in support of the statement that no consideration was paid and no chance was involved, refers only to testimony that an additional ticket was given to patrons (who had paid to enter) as they were leaving the theater, and that a ticket would be given to a "customer" gratuitously if he asked for it; and (4) that in the Cardas case the factual situation as to distribution of tickets was practically the opposite of the factual situation herein. In the Cardas case more than 7,000 drawing tickets were distributed free in the neighborhood, to passing motorists, and to pedestrians near the theater; a sign outside stated that tickets would be given free; the winning number was announced outside for the benefit of those who had not paid admission, and the holder of a winning ticket on the outside was permitted to enter the theater to claim the prize.

The decision in the Cardas case was a proper determination upon the facts therein that the drawing therein was not a lottery. That decision, however, is not determinative or at

all persuasive that the drawing herein, involving facts vastly different from those therein, was not a lottery. The presence of certain facts in that case, as to free distribution, and as to announcements and participation outside the theater, was the basis for the decision therein that the drawing was not a lottery, but in this case those or similar facts are not present and an opposite state of facts exists.

The winning ticket and the other drawing tickets were lottery tickets. A lottery ticket, as such, has no value and it cannot, in contemplation of law, be the subject of theft. (*People* v. *Caridis* (1915), 29 Cal.App. 166, 168 [154 P. 1061].) In that case the information charged that the defendant committed grand larceny, in that he had stolen a winning lottery ticket from an individual, after the drawing had occurred, and collected $1,250 thereon from the lottery company. It was held that the lottery ticket had no value, except perhaps as a mere piece of paper, and that the facts stated in the information did not constitute the public offense of grand larceny. On page 168 therein the court said: "The lottery ticket which was the subject matter of the larceny charged in the present case had no relative value save, as affirmatively alleged in the information, as the evidence of a debt due from an enterprise which was denounced by law and which apparently existed and was conducted by its promoters in defiance of the law. (Pen. Code, sec. 319 et seq.) It is a well-settled principle that an obligation which exists in defiance of a law which denounces it has, in the eye of the law, neither validity nor value." Considered as a piece of paper a lottery ticket might possess some slight intrinsic value which would suffice, insofar as the element of value in the crime of petty theft is concerned, to make the unlawful taking of it petty theft (*People* v. *Caridis, supra,* p. 169), but defendants herein were not charged with petty theft of the pieces of paper.

The number on the lottery ticket which Slater received from Mrs. Basile was the number which the lottery operator announced publicly from the stage was the winning number, after the ticket held by him was inspected by the theater's paymaster and found to be the winning ticket. Slater was invited by the lottery operator to present it to the master of ceremonies on the stage. The theater company was engaged in the operation of a lottery in defiance of law at the precise

moment that Slater, in response to such invitation of the lottery operator, presented the winning lottery ticket of that lottery to claim the lottery prize which was then and there being offered by the lottery operator to the participant in the lottery who held the winning ticket. The act therefore, which it is asserted constituted the attempt to commit theft, was not an act which was unrelated to the actual procedure of drawing the lottery, such as would be an effort to seize the prize by force or intimidation, or by taking and carrying it away during the absence or unawareness of the owner; but the act was a principal part of the lottery operator's actual manipulation and drawing of the lottery, and outwardly and on the face of the act it was in compliance with the rules prescribed by the lottery operator. The act of Slater in presenting the ticket was in violation of the rules of the lottery only in respect to the manner in which the ticket so presented was obtained originally from the lottery operator. An investigation indicated that it was a ticket which had been stolen from the lottery operator rather than one for which compensation had been paid to the lottery operator, i. e., rather than one which had been issued by the lottery operator to a patron of the theater at the time he paid admission or at the time he was leaving the theater.

In other words the basis for the accusation that a felony, attempted theft, was committed when Slater presented the winning lottery ticket is that the rules laid down by the lottery operator for playing the lottery had been violated, in that, the lottery ticket so presented had been stolen from the lottery operator. Specifically, as applied to this case, the rule violated was that the ticket had not been obtained originally from the theater company by purchase, but was stolen from it. Apparently, if the ticket had been issued or delivered in the first instance by the theater company to a person who had paid admission, even if thereafter it had been stolen from that patron, the presentation of it to claim the prize would not have been a violation of the rules of the lottery, inasmuch as there was no rule that the tickets were nontransferable. It therefore seems that the asserted culpability involved in the act of presenting the ticket was that it was not merely a ticket stolen from a patron who had paid the lottery operator for it at some time, but that it was a ticket stolen from the lottery operator and for which the operator had not been paid at any time.

The theory of the prosecution may have been that the ticket was of no value because it had been stolen from the theater company, and that the presentation of such a ticket was a false token or device by which an undue advantage of the theater company was about to be taken. The ticket was of no value, however, because it was a lottery ticket. The lottery ticket, as a matter of law, was not recognized by the People of the State as of any value, and was entitled to no recognition as a thing of value by anyone, including the lottery operator. The lottery operator, particularly, was charged with knowledge that its lottery ticket was valueless, and was not entitled to regard the presentation of the ticket as an implied or any representation that it was of value.

Neither the defendant, nor Slater, obtained the $500 or any part thereof as a result of the presentation of the ticket or at all. ■ The presentation of the stolen lottery ticket was a violation of the self-prescribed rules of the lottery operator for playing its lottery, but the violation of such rules is not a felony or other public offense. If the presentation of a stolen lottery ticket to claim the lottery prize in violation of the lottery rules is attempted theft, then the presentation of a lottery ticket to claim the lottery prize in violation of any of the various other rules which might be made, such as the tickets shall not be transferable, shall not be usable if dropped on the floor, and shall not be mutilated, would also be an attempt to commit theft. Of course, the rules adopted by a lottery operator for his unlawful lottery business do not have the effect of penal statutes.

If it were an offense against the People of the State to violate lottery rules in playing a lottery, the result would be to encourage the existence of lotteries which are prohibited by the Constitution and penal statutes. If the public force were brought to bear through the courts upon a person who, in playing the lottery, violated a lottery operator's private rules for playing the lottery, it would amount to enforcing the rules of the lottery and would be inconsistent with the provisions of the Constitution and penal statutes denouncing lotteries.

In *People* v. *Caridis, supra,* 29 Cal.App. 166, as above stated, the defendant, who was charged with grand larceny of a lottery ticket, actually collected $1,250 from the lottery operator by presenting the winning lottery ticket which he

had stolen. If the charge therein had been grand larceny of the $1,250 from the lottery company, the legal issues in that case and in the present case would have been the same. It is of some significance that the court therein, in ruling that the public offense of grand larceny had not been stated, referred (on p. 169) to petit larceny of the mere piece of paper as a probable ground for prosecution under those circumstances, but did not refer to the actual collection of $1,250 from the lottery company upon a stolen lottery ticket as a probable ground for a charge of grand larceny of the $1,250.

In *People* v. *Rosen* (1938), 11 Cal.2d 147 [78 P.2d 727, 116 A.L.R. 991], the defendant was charged with robbery. Over a period of months defendant lost sums of money in a lottery game. The operator of the game kept the money received from the game in a nearby shop of another person. Defendant, armed with a pistol and by putting the shop owner in fear, took from the shop a lesser amount of money than he had lost in gambling. The trial court refused to admit evidence offered by defendant in support of the defense that the taking was under a bona fide claim that the money lost by him belonged to defendant since it was money lost by him in an illegal game and he was only recapturing it. Defendant was convicted. The Supreme Court held that such evidence should have been admitted, and reversed the judgment. The court said on page 150: "It is the law in this state that certain games of chance, such as lotteries, are illegal; that the winner gains no title to the property at stake nor any right to possession thereof; and that the participants have no standing in a court of law or equity. [Citing cases.]" The court said further on page 151: "The view which seems to be consistent with the declared policy in this state is that the complaining witness, being in a sense *in pari delicto* with the accused, should not be heard in a court of justice on a charge of robbery against one whose only purpose was to retake money lost at an illegal game. This view neither condones nor invites the commission of crime, inasmuch as the accused must pay the penalty for the violation of any applicable penal law." (This last statement apparently had reference to a further statement therein that defendant was guilty of assault with a deadly weapon.) The theater company in operating the lottery was in a sense *in*

*pari delicto* with the defendants, if defendants had committed a public offense.

It is true that the prize money, even though it was designated and set apart as a lottery prize, remained subject to theft, did not lose its character as property, and did not become property which anyone could appropriate in any event to his own use merely because it was a lottery prize. The lottery operator was entitled to be secure in its lottery prize (except perhaps under the provisions of section 325 of the Penal Code, relating to forfeiture of lottery property) against interference therewith under various circumstances such as seizure thereof by force and intimidation, and the taking thereof during its absence or unawareness. The question here, however, is not whether it was entitled to be secure in its lottery prize, as just mentioned, against violence in the seizure thereof, or the removal thereof without its knowledge, but the question is whether the lottery operator was entitled to be secure, by virtue of the penal statutes, in its lottery prize against the violation of the self-prescribed rules for playing its lottery during the actual lottery drawing, i. e., whether the People of the State were offended by the violation of the lottery operator's rules for playing its lottery.

It might be argued that the fact the theater company was engaged in an unlawful act in operating the lottery would not justify an unlawful act by defendants; and that the fact the lottery operator should have been prosecuted also was immaterial insofar as the prosecution of defendants was concerned. Such an argument would be reasonable, but would not be an answer to the question herein whether the defendants committed a public offense in not adhering to the lottery rules. The act of presenting the ticket was an inseparable part of the unlawful lottery drawing, and the acts of the lottery operator and the defendants must be considered together in determining the property rights of the lottery operator and the personal rights of defendants.

The theater company was conducting a game denounced by law. While participating in the illegal game and as a part of it, defendants offered to the game operator at its invitation one of its illegal game tickets in an effort to obtain the game prize. In common parlance, the act of presenting the ticket was an attempt "to beat the lottery operator at its own illegal game," by not following the rules whereby it

planned to receive compensation for tickets used in playing the game. The People of the State are not concerned in promoting the financial or other success of a lottery operator, and are not offended if his rules for playing his lottery are violated. The presentation of the ticket was not the public offense of attempted grand theft. As above stated, the defendants were not charged herein with petty theft of the tickets as mere pieces of paper.

The judgments and the orders denying the motions for a new trial, as to both defendants, are reversed. The appeal from ''the orders'' entered on May 20, 1943, is dismissed.

Desmond, P. J., and Bishop, J. pro tem., concurred.