TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

```
        ------------------------------
                                  :
      OPINION                     :
                                  :
         of                       :      No. 87-906
                                  :
   JOHN K. VAN DE KAMP            :      April 20, 1988
     Attorney General            :
                                  :
      JACK R. WINKLER             :
 Assistant Attorney General      :
                                  :
 -----------------------------------------------------------------
```

THE HONORABLE THOMAS W. SNEDDON, JR., DISTRICT ATTORNEY OF SANTA BARBARA COUNTY, has requested an opinion on the following question:

May a charitable organization lawfully sponsor and conduct a "casino night" event for which tickets are sold to the general public where those attending would be given chips with which to play roulette, twenty-one and similar casino games and the chips won by the players would be used at the end of the event to (1) acquire raffle tickets to be drawn for valuable merchandise or (2) bid at auction for valuable merchandise?

CONCLUSION

A charitable organization may not lawfully sponsor or conduct a "casino night" event for which tickets are sold to the general public where those attending would be given chips with which to play roulette, twenty-one, and similar types of games and the chips won by the players would be used at the end of the event to (1) acquire raffle tickets to be drawn for valuable merchandise or (2) bid at auction for valuable merchandise.

ANALYSIS

We are informed that a charitable organization proposes to sponsor a "casino night" dinner event to which it will sell tickets to the general public. Each person attending would be given chips with which to play roulette, twenty-one, and similar types of "casino games." At the end of the evening the players would use the chips they had won either to acquire raffle tickets

to be drawn for valuable merchandise or to bid at auction for valuable merchandise.  The merchandise would be donated to the charitable organization by local merchants.  The charitable organization would use the ticket proceeds only for charitable purposes.  We are asked whether such an event would be lawful under California's gambling laws.  We conclude that it would not be lawful.

## Background

California's laws have always placed restrictions on certain forms of gambling.  Article IV, section 27 of the California Constitution of 1849 provided that "No lottery shall be allowed by this state, nor shall the sale of lottery tickets be allowed."  An act to license gaming passed March 14, 1851 prohibited "all banking games, and games having a percentage" and made violations a misdemeanor and also prohibited, with the same penalty, the playing of "the game known as 'French monte' or 'Three card game,' or the game known as 'Loop' or 'String game,' or the game known as 'Thimbles,' (a shell game) or the game known as 'Lottery.'"  The same act authorized counties to license gaming houses in which all but the games outlawed by name could be played.

The Constitution of 1879 continued the lottery prohibition in article IV, section 26 which provided: "The Legislature shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale in this State of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery."  The Legislature enacted chapters in the Penal Code prohibiting lotteries and other forms of gaming.

The Penal Code contains one chapter on lotteries (§§ 319-328), another on gaming (§§ 330-337s) and another on horse racing (§§ 337.1-337.9).  The chapter on lotteries makes many forms of participation in a lottery a misdemeanor and section 327[1] prohibits endless chain schemes.  The gaming chapter defines gaming in section 330 and prohibits slot machines, bookmaking and fixing sporting events among other things.  The chapter on horse racing prohibits touting among other things.

The California Constitution has been amended to allow specified forms of gambling.  Article IV, section 19 now provides:

"(a) The Legislature has no power to authorize lotteries and shall prohibit the sale of lottery tickets in the State.

---

[1]Section reference are to the Penal Code unless otherwise indicated.

"(b) The Legislature may provide for the regulation of horse races and horse race meetings and wagering on the results. [Originally adopted June 27, 1933 as art. IV, § 25a.]

"(c) Notwithstanding subdivision (a) the Legislature by statute may authorize cities and counties to provide for bingo games, but only for charitable purposes. [Added June 8, 1976.]

"(d) Notwithstanding subdivision (a), there is authorized the establishment of a California State Lottery. [Added Nov. 6, 1984.]

"(e) The Legislature has no power to authorize, and shall prohibit casinos of the type currently operating in Nevada and New Jersey. [Added Nov. 6, 1984.]"

From the beginning of statehood, California statutes have prohibited certain forms of gambling and allowed others. State statutes on gambling leave considerable scope for local regulation because the state has not preempted the whole field of gambling regulations. (Sullivan v. Fox (1987) 189 Cal.App.3d 673, 678.) We assume that no local ordinance is applicable since none was referred to in the question. Our task is to determine whether the "casino night" event contemplated by the question involves any of the forms of gambling prohibited by state law. Since the description of the event provided us speaks of roulette, twenty-one and similar types of "casino games" we assume that the event will not involve slot machines, horse racing, sporting events, or bingo. Our analysis will therefore focus on whether the "casino night" event violates California statutes prohibiting gaming and lotteries.

### Gaming

Penal Code Section 330 defining gaming provides:

"Every person who deals, plays, or carries on, opens, or causes to be opened, or who conducts, either as owner or employee, whether for hire or not, any game of faro, monte, roulette, lansquenet, rouge et noire, rondo, tan, fan-tan, stud-horse poker, seven-and-a-half, twenty-one, hokey-pokey, or any banking or percentage game played with cards, dice, or any device, for money, checks, credit, or other representative of value, and every person who plays or bets at or against any of said prohibited games, is guilty of a misdemeanor, and shall be punishable by a fine not less than one hundred dollars ($100) nor more than one thousand dollars ($1,000), or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment."

The crime defined in section 330 has two essential elements: (1) The game must be one of those proscribed and (2) the game must be played for money or representative of value. We will examine each of these elements to determine their application to the "casino night" described above.

Section 330 proscribes 12 games by name and two categories of games denominated "any banking or percentage game played with cards, dice, or any device," when played as described therein. Two of the twelve games listed by name are mentioned in the question, roulette and twenty-one. While many of the games listed have fallen into disuse all of them are prohibited by section 330 when played for money or representative of value. The games listed by name are prohibited by section 330 whether or not they are played as banking or percentage games. (People v. Gosset (1892) 93 Cal. 641, 646.) Section 330 prohibits the named games even though they are played with variations in the usual method of play. In People v. Gosset, supra, at page 643, the court held there was no error in refusing an instruction that "faro is played with a full deck of fifty-two cards." The court stated:

> ". . . , when a prohibited game is played in all other respects in the usual way, and according to its established rules, the purpose of the law cannot be thwarted by the simple devise of playing it with one or two cards less than the number usually employed. Otherwise no statute against a particular game would be of any value."

A banking game is one where there is a fund against which everybody has the right to bet, the bank taking all that is lost by the bettors and paying out all that is won by them. (People v. Carroll (1889) 80 Cal. 153, 157-158; People v. Ambrose (1953) 122 Cal.App.2d Supp. 966, 970.) "Banking game has come to have a fixed and accepted meaning: the 'house' or 'bank' is a participant in the game, taking on all comers, paying all winners, and collecting from all losers." (Sullivan v. Fox (1987) 189 Cal.App.3d 673, 678.)

A percentage game encompasses "any game of chance from which the house collects money calculated as a portion of wagers made or sums won in play, exclusive of charges or fees for use of space and facilities." (Sullivan v. Fox, supra, at p. 679.) A game may be a percentage game whether or not the house or bank participates as a player in the game. (Walker v. Meehan (1987) 194 Cal.App.3d 1290, 1299-1301.)

If one of the similar types of "casino games" referred to in the question is either a banking game or percentage game, as those terms have been defined by the courts, which is played with cards, dice, or any device it is prohibited by section 330 when it is played for money or representative of value.

Next we consider the requirement of section 330 that the game must be "played for money, checks, credit, or other representative of value." In People v. Carroll, supra, the information charged the defendant with conducting a banking game known as wheel of fortune in violation of section 330. The Supreme Court reversed the conviction stating (at p. 155):

"The information charges no offense under this section [section 330] of the code, or any other. To constitute it an offense to conduct the game, it must be 'played for money, checks, credit, or any other representative of value.' The information does not charge that the game was played for money, but that defendant conducted it for money. It may be that those who were engaged in the game were playing for amusement, and paid the defendant a fixed sum, in no way dependent upon the result of the game, for conducting it. This would be within the allegations of the information, but it would not be a public offense or within the statute." (Emphasis added by the court.)

Thus there is no violation of section 330 unless the players are playing the game for money or representative of value, i.e., with the expectation of winning money or representative of value. If the game is played without any expectation of winning money or representative of value there is no violation of section 330 even though the players may have paid something "in no way dependent upon the result of game" for the privilege.

In Ex parte Williams, (1906) 7 Cal.Unrep. 301 (Court of Appeal, Third District), 87 P. 565, the defendant was convicted of violating section 330 for conducting a banking game by means of a slot machine which his customers played for cigars. The machine was operated by dropping a nickel in the slot and pressing a lever which would cause a cylinder to move and display a combination of cards thereon. If the combination appearing was one of the designated winning poker hands the player received a designated number of cigars. For other combinations the player received nothing. On habeas corpus the court discharged the prisoner because the slot machine was played for cigars and not "for money, checks, credits, or other representatives of value." The court applied the rule of construction known as ejusdem generis to construe the words "other representative of value" to be limited to the same class of things as money, checks and credits. The court said: "Neither is it plain that the Legislature had in mind any kind of property other than money, the thing most common for use in such games, and its representative such as checks and demands for the payment of money." Finally the court said: "There is nothing in section 330 which prohibits gambling for cigars."

In In re Lowrie (1919) 43 Cal.App. 564 the defendant was charged with conducting a dice game known as Razzle Dazzle

described in detail in the complaint.  On habeas corpus the court held that the game was not a lottery as the complaint charged but that the facts alleged did constitute an offense defined in section 330 of the Penal Code and remanded the defendant to custody.  The complaint alleged that the game was played with five dice rolled simultaneously from a cup.  Each player would pay the defendant one dollar and receive ten chips in return.  Play began when a player made a bet by putting one or more of his chips on the board and the defendant then rolled the dice and counted the number of pairs he rolled.  The player then rolled the dice and counted the number of pairs he rolled.  If the player rolled more pairs or the same number of pairs with higher numbers he won and the defendant gave him the same number of chips he bet in addition to the chips he had bet.  If the player lost the defendant kept the chips that were bet.  Play then passed to the next player where the process was repeated.  When play was over the players purchased merchandise with the chips they had with each chip valued at ten cents.

The court first concluded that the game was a banking game and then stated that the game the defendant conducted "was not played for cigars or other merchandise, but for chips, each of which under the agreement and scheme represented the value of ten cents and was redeemable at such value by the defendant as banker, in merchandise selected by the winner of the chips, and hence they were representative of the value of the merchandise so received in exchange therefor."  The court added that "the merchandise given in exchange for the chips must be deemed of value and the value of the goods which, in accordance with the scheme, were given in exchange for the chips won was represented by the chips, possessing no intrinsic value whatever.  Hence, conceding the correctness of the Williams case, wherein it was held that the cigars constituting the stakes were not representative of value, it is distinguishable from the facts in the present case in that the chips played for were, under the scheme and agreement, intended to and did represent ten cents each in value, to be paid for and redeemed in merchandise."

While Lowrie distinguished the Williams case we think the distinction is illusory.  If the merchandise for which the chips were redeemed in Lowrie "must be deemed to have value" represented by the chips we fail to see why the cigars in Williams did not also have value which was represented by the winning combination of cards on the cylinder of slot machine.  In our view an appellate court would now reject the ejusdem generis construction of Williams and hold that when the game is played directly for valuable merchandise that such merchandise is "representative of value" within the meaning of section 330.

When we combine the lessons of the Carroll and Lowrie cases we see that whether chips are representative of value within the meaning of section 330 depends on whether the chips may be redeemed for money or something of value and not on what, if anything, was paid for the chips.  If we assume that the player

pays money for chips having no intrinsic value of their own which he then uses to participate in the game and wins additional chips in the process, unless he can redeem the chips he has won for money or representative of value it cannot be said that he "played" the game for money or representative of value as Carroll construed section 330. This is the reason the Lowrie case focused on the fact that the chips were redeemable for merchandise instead of the fact that the players had paid ten cents each for the chips. As we shall see this is in sharp contrast to the consideration element of a lottery which focuses upon what the players have paid for the chance to win.

Thus where the game is played for chips which may be redeemed for merchandise the chips represent the value of such merchandise and hence are "representative of value" within the meaning of section 330. In the "casino night" described the chips are not assigned a particular monetary value (like the ten cents in the Lowrie case) but this does not detract from the fact that they have the value of the merchandise for which they are redeemed and are thus "representative of value". This is particularly true where the chips are used to buy merchandise at auction at the end of the event. When the chips are used instead to buy raffle tickets a new factor is added to the scheme in that the redemption of the chips for merchandise is conditioned upon winning the raffle. In our view the fact that redemption of the chips for merchandise is conditioned upon winning a raffle does not render them valueless or prevent them from constituting a "representative of value" within the meaning of section 330. In other words the chance to win the raffle has a value which is represented by the chips.

We conclude that when persons make a wager with chips (whether acquired by gift or purchase) at a game of roulette or twenty-one or any other game prohibited by section 330, when the chips won may be used to (1) acquire raffle tickets to be drawn for valuable merchandise or (2) bid at auction for valuable merchandise, the chips are "representative of value" and section 330 is violated.

### Lotteries

Since the "casino night" described in the question includes a raffle and the playing of casino games which may be lotteries we now consider the statutory definition of a lottery.

Section 319 provides:

"LOTTERY DEFINED. A lottery is any scheme for the disposal or distribution of property by chance, among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it, or for any share or any interest in

7.

87-906

such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a lottery, raffle, or gift enterprise, or by whatever name the same may be known."

A lottery has three essential elements: (1) a prize; (2) distributed by chance; and (3) consideration. (California Gasoline Retailers v. Regal Petroleum Corporation (1958) 50 Cal 2d 844, 851.)  The statutory definition refers to the prize as "property" without any restrictive words and it has been held that the word "property" in section 319 is used in its most general sense. (People v. Settles (1938) 29 Cal.App.2d (Supp.) 781, 786.)  It includes real and personal property, money, goods, chattels, things in action, evidence of debt and obligations. (Id.)  The courts have recognized the following kinds of property to satisfy the prize element of a lottery:  $500 in cash, People v. Gonzales (1944) 62 Cal.App.2d 274, 275; a Buick automobile, Holmes v. Saunders (1952) 114 Cal.App.2d 389, 390; five dollars worth of merchandise, People v. Bardaty (1934) 139 Cal.App. (Supp.) 791, 793; a free trip to Catalina, People v. Cardas (1933) 137 Cal.App. (Supp.) 788, 789-790; the right to play further games free, People v. Settles, supra, at page 786.  (Cf. Gayer v. Whelan (1943) 59 Cal.App.2d 255, 263 in which the court held that the amusement afforded by a free game on a pinball machine was not a representative or thing of value within the meaning of section 330a prohibiting possession of a gambling device.)  The valuable merchandise for which raffle tickets are drawn referred to in the question would constitute a prize under the lottery statute.

A prize must be distinguished from a bet between two persons upon an uncertain future event.  In People v. Postma (1945) 69 Cal.App.2d (Supp.) 814 the defendants were engaged in bookmaking on horse races.  The court held that the defendants were not operating a lottery because there was nothing put up as a prize. (We hasten to add that bookmaking is outlawed by § 337a.)  At page 818 the court stated:

"When two persons bet with each other, it cannot be said that either of them, or the stakeholder, if there is one, has offered any property for disposal or distribution to persons who have paid a consideration for the chance of obtaining it.  Each bettor has put up his own property on a venture and at risk of losing it, but has not paid for the chance of winning that of the other bettor.  This is true at least where but two persons or two opposing sets of persons are concerned in the bet, as here.  In the case of a pari-mutuel pool to which many persons contribute, there are, perhaps (eliminating the question of chance), more persuasive reasons for considering the scheme a lottery than we find here." (Citing cases.)

The second element of a lottery requires that the prize be distributed by chance. Whether the distribution of a prize is distributed by chance is to be determined from the perspective of the players. Where the person conducting the scheme arbitrarily selects the winner the chance element of a lottery is present because "as to the purchaser it is uncertain, it is chance that luck and good fortune will give a large return for a small outlay." (People v. Hecht (1931) 119 Cal.App. (Supp.) 778, 787.) On the other hand where the persons conducting the scheme remove all element of chance in determining the winner by fraudulently contriving to have one of themselves selected as the winner the scheme is not a lottery. ( People v. Carpenter (1956) 141 Cal.App.2d 884, 888.) A trading stamp scheme is not a lottery because redemption of the stamps does not depend on chance. ( Ex Parte Drexel (1905) 147 Cal. 763, 768.)

Distribution of the prize may depend on skill rather than chance. Competitive shooting at a target is a game of skill and the fact that an entry fee is charged to compete for a prize at such a game does not convert the sport into a game of chance. (See Brown v. Board of Police Commissioners (1943) 58 Cal.App.2d 473, 477.) Frequently a game will have elements of both skill and chance. A game is not one of skill merely because that element enters into the result in some degree, or one of chance solely because chance is a factor in producing the result. ( People v. Settles, supra, at p. 787.) It is the character of the game rather than a particular player's skill or lack of it that determines whether the game is one of chance or skill. The test is not whether the game contains an element of chance or an element of skill but which of them is the dominating factor in determining the result of the game. (In re Allen (1962) 59 Cal.2d 5, 6.) Whether skill or chance dominates a particular game can be a difficult question of fact. (See People v. Settles, supra, at pp. 787-788.)

The courts have held the following methods to be distribution by chance. Drawing the winning ticket from a container; People v. Cardas (1933) 137 Cal.App. (Supp.) 788, 789-790. Spinning wheels to determine winning number; People v. Gonzales (1944) 62 Cal.App. 274, 277. Playing tango[2]; Einzig v. Board of Police Commissioners (1934) 138 Cal.App. 664; People v. Babdaty (1934) 139 Cal.App. (Supp.) 791. Adding dart throwing to qualify winners of tango game presented question on which the jury might reasonably have found either way as to whether skill or

---

[2]"Tango" is a game similar to bingo using bingo like cards in which the players participate in the selection of the letter-numbers drawn by taking turns throwing a rubber ball into a table of wooden pockets containing a pocket for each possible letter-number combination. As a rule the ball bounces around a lot before settling in a pocket.

chance was the dominant factor in determining the result. (<u>People</u> v. <u>Settles</u>, <u>supra</u>, 29 Cal.App.2d (Supp.) 781, 787.) Picking winners of five successive horse races in betting in a "5-10" pool[3] was held to be a lottery as a matter of law. (<u>Finster</u> v. <u>Keller</u> (1971) 18 Cal.App.3d 836.) A contest in which participants paying one dollar each selected the most appropriate captions for six cartoons in which prizes were awarded the best by a panel of judges was held to be a distribution by chance, because the elements of a bona fide contest of skill were not present. ( <u>People</u> v. <u>Rehm</u> (1936) 13 Cal.App.2d (Supp.) 755, 757.) The game of Ringo consisting of a bingo game in which players paid 25 cents for each card or got a free card if they tossed a small ring over a peg and the winner, to qualify for the prize had to toss a larger ring over a larger peg was held to be a game in which the game of bingo, one of pure chance, dominates. ( <u>People</u> v. <u>Shira</u> (1976) 62 Cal.App.3d 442, 462.)

In <u>In re Allen</u> (1962) 59 Cal.2d 5 the court held that the game of bridge was a game in which skill predominated and thus was not a game of chance. Draw poker is a game of chance. <u>Lavick</u> v. <u>Nitzberg</u> (1948) 83 Cal.App.2d 381, 382-383.) Roulette has been described as "a banking and a percentage game." (<u>Vasey</u> v. <u>Campbell</u> (1906) 4 Cal.App. 451, 453.) Rolling the ball into the groove above a spinning roulette wheel would appear to involve little skill, and none which would affect the place on the wheel on which the ball finnaly comes to rest. Shooting craps and other games in which the result depends on a throw of dice are generally held to be games of chance. (38 Am.Jur.2d, § 40; 66 Ops.Cal.Atty.Gen. 276, 283 (1983).) Keno is a game of chance. (64 Ops.Cal.Atty.Gen. 114, 116 (1981).) Twenty-one, or blackjack as it is sometimes called, is a game of chance. ( <u>Jacques</u> v. <u>State Board of Equalization</u> (1957) 155 Cal.App.2d 448; 65 Ops.Cal.Atty.Gen. 123, 128; 66 Ops.Cal.Atty.Gen. 276, 280.) In <u>Tooley</u> v. <u>U.S.</u> (D.Nev. 1955) 134 F. Supp. 162, 166-167, the court observed:

"No one will question the fact that craps, twenty-one and roulette are games of chance with percentages heavily loaded in favor of the house, yet there are some expert players, cross-roaders, who can outplay and break the house even on these admitted gambling games. But that does not convert these games from games of chance to games of skill."

---

[3]While skill may dominate successful performance of a single event chance rapidly overtakes skill when one wagers on the successful repetition of that event. Thus a basketball player who sinks 2 free throws out of 3 for the season has less than an even chance ($2/3 \times 2/3 = 4/9$) to sink two in a row, less than one chance in three ($2/3 \times 2/3 \times 2/3 = 8/27$) to sink three in a row and less than one chance in five ($16/81$) to sink four in a row.

Applying the distribution by chance element of a lottery to the "casino night" described in the request, we note that both roulette and twenty-one are games of chance, not of skill. Both games therefore constitute lotteries when played for prizes by players who have paid a consideration for the chance to win. Similar "casino games" of chance, such as craps, would also constitute lotteries when played in like manner. It is assumed that the "drawing" of the winning raffle tickets referred to in the question will be selected at random from a container holding all the eligible raffle tickets. Thus the distribution of the merchandise as prizes would be by chance making the a raffle a lottery if the players paid a consideration for the chance to win.

The third element of a lottery is consideration. The question of consideration is to be determined from the standpoint of the holders of the tickets who might win the prize, not from the standpoint of those who are conducting the event. ( People v. Cardas (1933) 137 Cal.App. (Supp.) 788, 791; Cal. Gas Retailers v. Regal Petroleum Corp. (1958) 50 Cal.2d 844, 860.) This follows clearly from the statutory definition that it is the distribution of property by chance "among persons who have paid or promised to pay any valuable consideration for the chance of obtaining such property or a portion of it." ( Cal. Gas Retailers v. Regal Petroleum Corp., supra, at p. 860.)

The kind of consideration necessary for a lottery is not as extensive as the consideration necessary for a contract. Civil Code section 1605 provides that "any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise." The benefit conferred language will not suffice as consideration for a lottery because it is what is paid by the ticket holder that determines consideration for a lottery, not what benefit is conferred on the sponsor. Thus the fact that the sponsor's business is enhanced does not provide the consideration necessary to make a promotion a lottery. ( Cal. Gas Retailers v. Regal Petroleum Corp., supra, at p. 862.)

The question to be answered on the consideration element was stated three ways by the court in People v. Cardas, supra, at pages 790-791: Was a valuable consideration paid for the chance of winning the prize by those who stood to win? Was anything of value hazarded upon the chance by them? Did the holders of the prize tickets pay a valuable consideration for the chance? Since the statutory definition requires that the consideration necessary is a "valuable one" paid, or promised to be paid by the one receiving the ticket, the fact that a ticket holder must go to the place of business of the sponsor of the scheme to deposit the ticket stub

cannot be considered the necessary consideration. ( <u>Cal. Gas Retailers</u> v. <u>Regal Petroleum Corp.</u>, <u>supra</u>, at pp. 861-862.)

The consideration to make a transaction a lottery need not be paid exclusively for the chance to win the prize. It is sufficient that the consideration be paid for something else and the chance to win the prize. ( <u>People</u> v. <u>Gonzales</u> (1944) 62 Cal.App.2d 274, 279-280; <u>Holmes</u> v. <u>Saunders</u> (1952) 114 Cal.App.2d 389, 390-391; <u>Cal. Gas Retailers</u> v. <u>Regal Petroleum Corp.</u>, <u>supra</u>, at p. 859.)

A game does not cease to be a lottery because some are admitted to play without paying for the privilege, so long as others paid for their chances. ( <u>People</u> v. <u>Shira</u> (1976) 62 Cal.App.3d 442, 460.)

Where, in a business promotion plan, there is a general and indiscriminate distribution of free prize tickets whether or not the recipients have made a purchase and valuable prizes are awarded to those holding winning tickets selected by chance, the plan is a gratuitous distribution of property, not a lottery because the ticket holders did not pay a valuable consideration for their tickets. ( <u>People</u> v. <u>Cardas</u>, <u>supra</u>; <u>People</u> v. <u>Carpenter</u>, <u>supra</u>; and <u>Cal. Gas Retailers</u> v. <u>Regal Petroleum Corp.</u>, <u>supra</u>.)

While it is simple to state the foregoing rules announced by the courts to determine the consideration element of a lottery their application to particular cases can be difficult. One reason is the difficulty in choosing which rules apply. Where prize tickets are given both to those who have made a purchase and those who have not, does the rule that the consideration need not be paid exclusively for the chance to win apply so the purchase price paid is not only for the merchandise but also for the chance to win? Does the rule that the game does not cease to be a lottery because some play free while others must pay apply? Or it this just a business promotion with a gratuitous distribution of property? The key to which of these rules apply lies in whether the distribution of free tickets has been "general and indiscriminate". Only when the court concludes that the distribution of free tickets is such that it can realistically be said that the person who bought merchandise did not pay for his ticket because he could have got one free without making the purchase will it be concluded that the person did not pay a valuable consideration for the chance to win the prize. (<u>People</u> v. <u>Shira</u>, <u>supra</u>, at pp. 459-460.)

In <u>Cal. Gas Retailers</u> v. <u>Regal Petroleum Corp.</u>, <u>supra</u>, at page 859, the court rejected any mechanical application of rules to determine whether a scheme is a lottery. Quoting from 34 American Jurisprudence 650 the court said:

". . . that no sooner is the term 'lottery' defined by a court, than ingenuity evolves some scheme within the

mischief discussed, although not quite within the letter of the definition given; but an examination of the many cases on the subject will show that it is very difficult, if not impossible, for the most ingenious and subtle mind to devise any scheme or plan, short of a gratuitous distribution of property, which has not been held by the courts of this country to be in violation of the lottery laws. . . . The court will inquire, not into the name, but into the game, however skillfully disguised, in order to ascertain if it is prohibited."

Thus the courts will cut to the heart of the scheme to determine whether the players paid a valuable consideration for the chance to win the prize however that consideration may be disguised. An examination of six cases which have considered the element of consideration in a lottery will provide some insight on how California courts have applied the rules discussed above.

In <u>Holmes</u> v. <u>Saunders</u>, <u>supra</u>, a numbered ticket was provided to each person who paid $1 for a six months subscription to a publication in a subscription drive. The holder of the winning ticket to be drawn on a specified date at the Oakland Auditorium Arena would receive a Buick automobile. The court held this was a lottery stating that "the consideration to make such a transaction a lottery need not be paid exclusively for the chance to win the prize. It is sufficient that the consideration, as here, be paid for something else and the chance to win the prize."

In <u>People</u> v. <u>Cardas</u>, <u>supra</u>, a theater owner advertised that free trips to Catalina would be given to the holders of winning prize tickets. Five thousand prize tickets were distributed with programs in the neighborhood of the theater and 2000 others were distributed to passing motorists. Others were handed out in front of the theater to patrons and non-patrons alike. No prize tickets were given by the cashier who sold admission tickets and it was not necessary to buy an admission ticket to secure a prize ticket. The prize ticket stubs were deposited in a receptacle outside the theater. The drawing was held on the stage but the winning numbers were announced both inside and outside the theater. A person with a winning ticket could enter the theater to claim the prize without paying an admission. The court held that this was not a lottery because "those who purchased admission tickets and received prize tickets, . . . could not be said to have paid a consideration for the prize tickets since they could have received them free."

<u>People</u> v. <u>Gonzales</u>, <u>supra</u>, was another theater promotion involving five theaters. Every two weeks $500 was awarded in a "cash night" drawing to the holder of the winning ticket. The winning number was determined by spinning wheels and announcing it simultaneously over the public address systems in all five theaters. One minute was given for the holder of the winning

ticket to claim the prize. One prize ticket was given for each admission ticket bought at the time of purchase and another was handed to each patron as they left the theater. No ticket was given to anyone who had not paid for an admission. There were no announcements or participation outside the theater. The court held the cash night to be a lottery. The court distinguished People v. Cardas, supra, at page 281 by "the fact that there was a general and indiscriminate distribution of the drawing tickets irrespective of whether admission was paid; that attendance inside the theater was not a prerequisite to participation in the drawing; and announcement was made outside the theater for the benefit of non-customers."

Cal. Gas Retailers v. Regal Petroleum Corp., supra, involved an advertising and merchandising plan by the operators of several gas stations. Prize tickets were given away free to anyone who asked for them, and to many who did not ask for them both at and away from the stations. Receipt of the tickets was not dependent on any purchase. Ticket stubs had to be deposited at one of the stations. Winning ticket numbers were drawn periodically and posted at each station. The winner had a week to claim his prize. In some cases the scheme was financed by adding a cent to the price of the gasoline which was passed on to the customers. The court held there was no lottery because it clearly appeared from the record that any person could have received a ticket, free for the asking, without making any kind of purchase.

In Polonsky v. City of South Lake (1981) 121 Cal.App.3d 464 the court held that where the city issued a limited number of building permits to those applicant lot owners selected by lot, the fact that the city charged a fee to the applicants to pay for the cost of notifying all lot owners of the plan did not constitute consideration necessary to make the plan a lottery.

People v. Shira, supra, involved a game called "Ringo" played in an amusement zone in Long Beach. The defendant had a city license for his "Amusement-Skill" business. The game consisted of a regular bingo game, preceded by a small ring toss phase to qualify those who would play the bingo game, and followed by large ring toss to qualify the bingo winner for the prize. In the small ring toss each person was given small red ring free of charge. If he succeeded in tossing it over a small peg he would get two bingo cards free and could participate in the bingo game without charge. If he missed the toss he could buy a small white ring for 25 cents and receive two bingo cards with it. Those who succeeded in tossing the white ring over the peg got their 25 cents back but not if they missed. In either case they played the bingo cards. Only 12 percent of those playing bingo got their cards free by successfully tossing the small rings. After winning at bingo the person won the prize only if he succeeded in tossing a larger ring over a larger peg. The court held that Ringo was an illegal lottery because the vast majority of the bingo players must pay a

valuable consideration (25 cents) for the chance to win and the game of bingo, one purely of chance, dominated over the skill involved in the ring tosses. The court analyzed the Cardas, Gonzales, Carpenter, and Regal cases at great length. The court stated (at p. 459):

> "We construe the implicit holdings of those four cases to be, as they pertain to the presence or absence of the element of consideration, that in order for a promotional giveaway scheme to be legal any and all persons must be given a ticket free of charge and without any of them paying for the opportunity of a chance to win the prize. Conversely, a promotional scheme is illegal where any and all persons cannot participate in a chance for the prize and some of the participants who want a chance to win must pay for it."

> "In Cardas, Carpenter, and Regal the schemes lacked the element of consideration and were legal because there was a general and indiscriminate system of distribution of the drawing tickets and the money paid by the patrons for the admission ticket to the theater or for gasoline was no more than consideration for viewing the movie or for the gasoline itself. The element of consideration in the promotional scheme in Gonzales and the scheme were illegal because there was not a general and indiscriminate distribution of the drawing tickets and money paid for an admission ticket to the theater also constituted consideration paid for the chance at the prize."

In the "casino night" described in the question we are advised that the chips are "given" to those buying tickets to the event. There is no indication that any of the chips to be used at the games would be given away free to those who did not buy tickets. Thus there is no general and indiscriminate distribution of free chips to make this a gratuitous distribution of property. Instead we believe the courts would find that a portion of the price paid for the "casino night" tickets paid for the chips and thus provided the consideration requisite for a lottery.

The players use the chips first to play the casino games at which they would either lose some or all of their chips or win more of them. Some of the "casino games", including roulette, would constitute lotteries in that the players paid valuable consideration for the chips for the chance to win a prize. After the games are over we are advised that the players would use the chips they had left or had won to buy raffle tickets for valuable merchandise. As section 319 indicates, a raffle is another name for a lottery. The valuable merchandise (the prize) is distributed by chance (drawing the winning ticket) to those who have paid a valuable consideration (for the chips) for the chance to win.

15.                                                                    87-906

The other use of the chips referred to in the question is their use in bidding at an auction for valuable merchandise. Since the auction comes at the end of the event most of the chips used at the auction will be those which have been won at the gaming tables. The auction provides the means of converting those chips into valuable merchandise, making them "representative of value" and an essential element making the playing of such games a violation of section 330.

## Participation

In addition to the elements discussed above a person must participate in a prohibited game or lottery in a manner specified by statute to violate the gaming and lottery laws. Merely being a spectator does not violate either law.

Section 330 provides that "every person who deals, plays, or carries on, opens, or causes to be opened, or who conducts, either as owner or employee, whether for hire or not" a game prohibited therein and "every person who plays or bets at or against any of said prohibited games" is guilty of a misdemeanor. Anyone who carries on or conducts a prohibited game played for money violates section 330 whether or not he is an employer or employee. (People v. Sam Lung (1886) 70 Cal. 515, 517.) Applying this language to the "casino night" described, those who deal, play, or bet at or against a prohibited game as well as those who open, cause to be open, carry on or conduct a prohibited game would violate section 330.

Section 320 provides that "Every person who contrives, prepares, sets up, proposes, or draws any lottery, is guilty of a misdemeanor." Section 321 provides that "Every person who sells, gives, or in any manner whatever, furnishes or transfers to or for any other person any ticket, chance, share, or interest, or any paper, certificate, or instrument purporting or understood to be or to represent any ticket, chance, share, or interest in, or depending upon the event of any lottery, is guilty of a misdemeanor." Section 322 provides that "Every person who aids or assists, either by printing, writing, advertising, publishing, or otherwise in setting up, managing, or drawing any lottery, or in selling or disposing of any ticket, chance, or share therein, is guilty of a misdemeanor." Section 326 provides that "Every person who lets, or permits to be used, any building or vessel, or any portion thereof, knowing that it is to be used for setting up, managing, or drawing any lottery, or for the purpose of selling or disposing of lottery tickets, is guilty of a misdemeanor."

Applying this language to the "casino night" described, those who propose, prepare, set up, furnish chips with the "casino night" tickets, transfer raffle tickets for chips, assist in the raffle drawing, or in some other manner participate in a lottery in

a manner prohibited by the above quoted sections are guilty of a misdemeanor.

The question states that the "casino night" will be sponsored and conducted by a charitable organization.  Of course this will be done by individuals who are acting on behalf of the organization.  If any of these individuals do any of the acts prohibited by the gaming or lottery statutes the fact that they acted on behalf of a charitable organization will not provide any defense to such violations.  Nor will the fact that the proceeds of the "casino night" will be used only for charitable purposes provide any defense to their violations.  (See 64 Ops.Cal.Atty.Gen. 114, 117 (1981).)  The only exception in California's gambling laws for charities is that provided in section 326.5 authorizing cities and counties to authorize certain organizations to conduct bingo games for charitable purposes only.

We conclude that a charitable organization may not lawfully sponsor or conduct a "casino night" event for which tickets are sold to the general public where those attending would be given chips with which to play roulette, twenty-one, and similar types of games and the chips won by the players would be used at the end of the event to (1) acquire raffle tickets to be drawn for valuable merchandise or (2) bid at auction for valuable merchandise.

* * * * *